UNITED STATES EX REL. MILWAUKEE SOCIAL DEMOCRATIC PUBLISHING COMPANY v. BUR-LESON, POSTMASTER GENERAL OF THE UNITED STATES.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 155.   Argued January 18, 19, 1921.—Decided March 7, 1921.

1. The provision of the Espionage Law (Act of June 15, 1917, c. 30, Title XII, § 3, 40 Stat. 217) which denies the mails to newspapers and other publications violating its prohibitions, was within the power of Congress. P. 409.

2. The second-class mail privilege, previously granted for a news-paper, was revoked by the Postmaster General, upon due notice and hearing, because, from the time the United States entered the World War to the time of the revocation, the paper frequently and persistently printed articles conveying false reports and false state-ments with intent to promote the success of the enemies of the United States and constituting a wilful attempt to cause disloyalty and refusal of duty in the military and naval forces and to obstruct the recruiting and enlistment service. *Held*, that the procedure satisfied due process of law, p. 409; that the publication was clearly violative of § 3 of the Espionage Law, p. 413; that the order did not deprive the publisher of constitutional rights of free speech, or free press, or of property without due process of law, and was amply justified by the evidence. Pp. 409, 415.

3. The conclusion of a head of an executive department upon a matter of fact within his jurisdiction will not be disturbed by the courts unless clearly wrong. P. 413.

4. By long executive practice, admission to the second-class mail privilege is obtained for a publication only by a permit, issued by the Postmaster General, after a hearing and upon a showing satis-factory to him or his authorized assistants, that it contains and will continue to contain only mailable matter and that it will meet the other requirements of the law. Pp. 410, 415.

5. The power of the Postmaster General to revoke the privilege is an incident of the power to grant it, recognized by Congress (31 Stat. 1107) and by decisions of this court. Pp. 411, 415.

6. When a newspaper which has been admitted to the second-class privilege publishes non-mailable matter so frequently as to justify the presumption that it will continue to do so, the Postmaster General is empowered (Rev. Stats., § 396) to revoke the privilege, not merely as to particular issues containing such matter, but indefinitely for the future, subject to the publisher's right to secure a renewal upon proper application and proof that the paper will conform to the law. P. 416.

49 App. D. C. 26; 258 Fed. Rep. 282, affirmed.

ERROR to review a judgment of the Court of Appeals of the District of Columbia which affirmed a judgment of the Supreme Court of the District dismissing the relator's petition for a writ of mandamus against the Postmaster General. The facts appear in the opinion of the court.

*Mr. Henry F. Cochems*, with whom *Mr. Hubert O. Wolfe* and *Mr. Seymour Stedman* were on the brief, for plaintiff in error.

*The Solicitor General* and *Mr. William H. Lamar* for defendant in error.

*Mr. S. John Block* and *Mr. Seth Shepard*, by leave of court, filed a brief as *amici curiæ*.

MR. JUSTICE CLARKE delivered the opinion of the court.

After a hearing on September 22, 1917, by the Third Assistant Postmaster General, of the time and character of which the relator (plaintiff in error) had due notice and at which it was represented by its president, an order was entered revoking the second-class mail privilege granted to it in 1911 as publisher of the Milwaukee Leader. So far as appears, all that the relator desired to say or offer was heard and received. This hearing was had and

the order was entered upon the charge that articles were appearing in relator's paper so violating the provisions of the National Defense Law, approved June 15, 1917, which has come to be popularly known as the Espionage Act of Congress (c. 30, 40 Stat. 217), as to render it "nonmailable " by the express terms of Title XII of that act. On appeal to the Postmaster General the order was approved. Thereupon the relator filed a petition in the Supreme Court of the District of Columbia, praying that a writ of mandamus issue, commanding the Postmaster General to annul his order and restore the paper to the second-class privilege. To a rule to show cause the Postmaster General answered, and a demurrer to his answer being overruled and the relator not pleading further, the court discharged the rule and dismissed the petition. The Court of Appeals of the District of Columbia affirmed the judgment of the trial court, and the constitutional validity of laws of the United States being involved the case was brought here by writ of error.

The grounds upon which the relator relies, are, in substance, that, to the extent that the Espionage Act confers power upon the Postmaster General to make the order entered against it, that act is unconstitutional, because it does not afford relator a trial in a court of competent jurisdiction, that the order deprives relator of the right of free speech, is destructive of the rights of a free press, and deprives it of its property without due process of law.

That a hearing, such as was accorded the relator, on precisely such a question as is here involved, when fairly conducted, satisfies all of the requirements of due process of law, has been repeatedly decided. *Smith* v. *Hitchcock,* 226 U. S. 53, 60; *Bates & Guild Co.* v. *Payne,* 194 U. S. 106; *Public Clearing House* v. *Coy e,* 194 U. S. 497; *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288.

Since the petition in this case was filed, it has also become settled that the Espionage Act is a valid, constitu-

tional law.  *Schenck* v. *United States,* 249 U. S. 47; *Froh-werk* v. *United States,* 249 U. S. 204; *Debs* v. *United States,* 249 U. S. 211; *Abrams* v. *United States,* 250 U. S. 616, 619.

The first comprehensive law providing for the classification of mails was enacted on March 3, 1879 (c. 180, 20 Stat. 355). From that time to this, mail classification, frequently approved by this court, has dealt only with "mailable matter." In § 7 of that act, still in effect, "mailable matter " is divided into four classes, and, by § 10, the second class of such "mailable matter" is defined as including newspapers and periodicals. By § 1 of Title XII of the Act of June 15, 1917, *supra,* any newspaper violating any provision of the act is declared to be "non-mailable matter," which shall "not be conveyed in the mails or delivered from any post office or by any letter carrier."

The extremely low rate charged for second-class mail—to carry it, was said, in argument, to cost seven times the revenue which it yields—is justified as a part of "the historic policy of encouraging by low postal rates the dissemination of current intelligence." It is a frank extension of special favors to publishers because of the special contribution to the public welfare which Congress believes is derived from the newspaper and other periodical press. 229 U. S. 301, 304.

By now more than forty years of departmental practice, admission to the privilege of this second-class mail has been obtained for a publication only by a permit, issued by the Postmaster General after a hearing and upon a showing made, satisfactory to him, or his authorized assistants, that it contains and will continue to contain only mailable matter and that it will meet the various statutory and other requirements. *Houghton* v. *Payne,* 194 U. S. 88, 94.

That the power to suspend or revoke such second-class privilege was a necessary incident to the power to grant it has long been recognized by statute and by many decisions

of this court. (31 Stat. 1107; *Smith* v. *Hitchcock*, 226 .
U. S. 53, 57; *Houghton* v. *Payne*, 194 U. S. 88; *Bates &*
*Guild Co.* v. *Payne*, 194 U. S. 106.) Under these statutes
and decisions, if the newspaper of the relator had come to
be so edited that it contained other than "mailable
matter," plainly it was the intention of Congress that it
should no longer be carried as second-class mail and there-
fore the order to revoke the permit which had been granted
to relator was proper and justified,—and that it had be-
come so changed in character is the holding of the Post-
master General and of the two lower courts which we are
reviewing.

For the purpose of preventing disloyalty and disunion
among our people of many origins, and to the end that a
united front should be presented to the enemy, the Espion-
age Act, one of the first of the National Defense laws
enacted by Congress after the entry of the United States
into the World War (approved June 15, 1917, 40 Stat. 217),
provided severe punishment for any person who "when
the United States is at war" shall wilfully make or convey
false reports or false statements with intent to interfere
with the operation and success of the military or naval
forces of the country, or with the intent to promote the
success of its enemies, or who shall cause, or attempt to
cause, insubordination, disloyalty, mutiny or refusal of
duty in such forces, or who shall wilfully obstruct the
recruiting and enlistment service of the United States
(§ 3). One entire title of this act (Title XII) is devoted to
"Use of Mails," and in the exercise of its practically
plenary power over the mails (*Ex parte Jackson*, 96 U. S.
727; *Public Clearing House* v. *Coyne*, 194 U. S. 497, 506,
507; *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288, 313),
Congress therein provided that any newspaper published
in violation of any of the provisions of the act should be
"*non-mailable*" and *should not be "conveyed in the mails or*
*delivered from any post office or by any letter carrier.*"

It was under the provisions of this war-time act, and under the specific injunction of § 396 of the Revised Statutes of the United States, declaring it to be the duty of the Postmaster General to "superintend generally the business of the [Post Office] department, and execute all laws relative to the postal service," that the order in this case was entered.

The Postmaster General avers that, upon the hearing which we have described, he found that, beginning within a week after the declaration of war against the German Government and continuing to the date of the revocation of the second-class privilege herein, the relator had published in its newspaper frequently, often daily, articles which contained false reports and false statements, published with intent to interfere with the success of the military operations of our Government, to promote the success of its enemies, and to obstruct its recruiting and enlistment service. For this cause, exercising the power which we have seen had been invested in the Postmaster General by statute for almost forty years, and which had frequently been exercised by his predecessors, the respondent revoked the second-class privilege which had been granted to the relator. A similar executive authority with respect to matters within their jurisdiction has been given to the heads of all the great departments of our Government and is constantly exercised by them.

This is neither a dangerous nor an arbitrary power, as was argued at the bar, for it is not only subject to review by the courts [the claim of the relator was heard and rejected by two courts before this re-examination of it in this court] but it is also subject to control by Congress and by the President of the United States. Under the Constitution, which we shall find it vehemently denouncing, the rights of the relator were, and are, amply protected by the opportunity thus given it to resort for relief to all three departments of the Government, if those rights

should be invaded by any ruling of the Postmaster General.

All this being settled law, there remains the question whether substantial evidence to support his order may be found in the facts stated in the Postmaster General's answer, which are admitted by the demurrer, for the law is, that the conclusion of the head of an executive department of the Government on such a question, when within his jurisdiction, will not be disturbed by the courts unless they are clearly of the opinion that it is wrong. *Smith* v. *Hitchcock*, 226 U. S. 53, 60; *Houston* v. *St. Louis Independent Packing Co.*, 249 U. S. 479, 484, and cases cited.

In the answer of the Postmaster General there were quoted more than fifty excerpts from editorial articles which appeared in relator's newspaper at intervals between April 14 and September 13, 1917,—the first five months after our country entered the great war—upon consideration of which, with others not reproduced, he averred, his order was based.

Without going much into detail: It was declared in the quoted articles, that the war was unjustifiable and dishonorable on our part, a capitalistic war, which had been forced upon the people by a class, to serve its selfish ends. Our Government was denounced as a "plutocratic republic," a financial and political autocracy, and resident Russians were praised for defaming it. Other articles denounced the draft law as unconstitutional, arbitrary and oppressive, with the implied counsel that it should not be respected or obeyed, and it was represented that soldiers in France were becoming insane in such numbers that long trains of closed cars were being used to convey them away from the battle front. It was confidently asserted that the Constitution of the United States was purposely made difficult of amendment in order that we might not have real democracy in this country, the President was de-

nounced as an autocrat, and the war legislation as having
been passed by a "rubber stamp Congress." In the guise
of argument these articles sought to convince the readers
of them that soldiers could not legally be sent outside the
country and that our Government was waging a war of
conquest when Germany was ready to make an honorable
peace. The Food Control Law was denounced as "Kaiser-
izing America." It was declared that we were fighting for
commercial supremacy and world domination only and
that when the "financial kings" concluded that further
fighting might endanger their loans to the Allies, they
would move for peace, which would quickly come. Our
"Allies" were repeatedly condemned and our enemies
frequently praised.

These publications were not designed to secure amend-
ment or repeal of the laws denounced in them as arbitrary
and oppressive, but to create hostility to, and to encour-
age violation of, them. Freedom of the press may protect
criticism and agitation for modification or repeal of laws,
but it does not extend to protection of him who counsels
and encourages the violation of the law as it exists. The
Constitution was adopted to preserve our Government,
not to serve as a protecting screen for those who while
claiming its privileges seek to destroy it.

Without further discussion of the articles, we cannot
doubt that they conveyed to readers of them, false reports
and false statements with intent to promote the success of
the enemies of the United States, and that they constituted
a willful attempt to cause disloyalty and refusal of duty in
the military and naval forces and to obstruct the recruit-
ing and enlistment service of the United States, in viola-
tion of the Espionage Law (*Schenck* v. *United States, Froh-
werk* v. *United States,* and *Debs* v. *United States, supra*),
and that therefore their publication brought the paper
containing them within the express terms of Title XII
of that law, declaring that such a publication shall be

"non-mailable" and "shall not be conveyed in the mails or delivered from any post office or by any letter carrier."

While written more adroitly than the usual pro-German propaganda of that time, they nevertheless prove clearly that the publisher of these articles was deliberately and persistently doing all in its power to deter its readers from supporting the war in which our Government was engaged and to induce them to lend aid and comfort to its enemies. The order of the Postmaster General not only finds reasonable support in this record but is amply justified by it.

We shall notice further only the contention that if it should be found that the Postmaster General had authority to revoke the second-class privilege as to a single issue of the paper, nevertheless he did not have power to make such an order applicable to the indefinite future.

The second-class privilege ever since 1879 has been granted to a newspaper, as we have seen, only on application of its publisher for entry of it to that class. Upon such an application, a searching investigation of the character of the publication is made by the Postmaster General, under rules and regulations prescribed by him, which experience has proved necessary to prevent frauds upon the Government (United States Postal Laws and Regulations, 1913, §§ 411 to 435, inclusive; 229 U. S. 306), and two representative copies of the issue nearest to the date of the application are required to be filed. If the publication is found to be entitled to the second-class privilege, a permit to that effect is issued, which contains, as did the permit to the relator, the provision that "the authority herein given is revocable upon determination by the Department that the publication does not conform to the law." Such a permit, however, would be equally revocable without any such specific reservation. (31 Stat. 1107; *Smith* v. *Hitchcock,* 226 U. S. 53, 60).

It is a reasonable presumption that the character of the publication as one entitled to the second-class privilege, when thus established, will continue to be substantially maintained, and therefore such a permit is made applicable to the indefinite future. For the same reason, and because it would not be practicable to examine each issue of a newspaper, the revocation of a permit must continue until further order. Government is a practical institution, adapted to the practical conduct of public affairs. It would not be possible for the United States to maintain a reader in every newspaper office of the country to approve in advance each issue before it should be allowed to enter the mails, and when, for more than five months, a paper had contained, almost daily, articles which, under the express terms of the statute, rendered it "non-mailable," it was reasonable to conclude that it would continue its disloyal publications and it was therefore clearly within the power given to the Postmaster General by Rev. Stats., § 396, to "execute all laws relative to the postal service," to enter, as was done in this case, an order suspending the privilege until a proper application and showing should be made for its renewal. The order simply withdrew from the relator the second-class privilege, but did not exclude its paper from other classes, as it might have done, and there was nothing in it to prevent reinstatement at any time. It was open to the relator to mend its ways, to publish a paper conforming to the law, and then to apply anew for the second-class mailing privilege. This it did not do, but, for reasons not difficult to imagine, it preferred this futile litigation, undertaken upon the theory that a Government competent to wage war against its foreign enemies was powerless against its insidious foes at home. Whatever injury the relator suffered was the result of its own choice and the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BRANDEIS, dissenting.

This case arose during the World War; but it presents no legal question peculiar to war. It is important, because what we decide may determine in large measure whether in times of peace our press shall be free.

The denial to a newspaper of entry as second-class mail, or the revocation of an entry previously made, does not deny to the paper admission to the mail; nor does it deprive the publisher of any mail facility. It merely deprives him of the very low postal rates, called second class, and compels him to pay postage for the same service at the rate called third class, which was, until recently, from eight to fifteen times as high as the second-class rate.[1] Such is the nature and the only effect of an order denying or revoking the entry. See Postal Laws and Regulations, §§ 421, 422 and 423. In this case entry to the second-class mail was revoked because the paper had, in the opinion of the Postmaster General, systematically inserted editorials and news items which he deemed unmailable. The question presented is: Did Congress confer upon the Postmaster General authority to deny second-class postal rates on that ground? The question is one of statutory construction. No such authority is granted in terms in the statutes which declare what matter shall be unmailable. Is there any provision of the postal laws from which the intention of Congress to grant such power may be inferred? The specific reason why the Postmaster General deemed these editorials and news items unmailable was that he considered them violative of Title XII of the Espionage Act. But it is not contended that this specific reason is of

[1] Act of March 3, 1885, c. 342, § 1, 23 Stat. 387; Act of March 3, 1879, c. 180, § 17, 20 Stat. 359–360. Compare Act of October 3, 1917, c. 63, § 1101, 40 Stat. 327. See Message of the President, February 22, 1912, transmitting the Report of the Commission on Second-Class Mail Matter, 62d Cong., 2d sess., H. R. Doc. 559, pp. 56–61.

legal significance. The scope of the Postmaster General's alleged authority is confessedly the same whether the reason for the nonmailable quality of the matter inserted in a newspaper is that it violates the Espionage Act, or the copyright laws, or that it is part of a scheme to defraud, or concerns lotteries, or is indecent, or is in any other respect matter which Congress has declared shall not be admitted to the mails.[1] The question of the scope of the Postmaster General's power is presented to us on the following record:

Some years prior to 1917 The Milwaukee Leader, a daily newspaper published by the Milwaukee Social Democratic Publishing Company, made application to use the second-class mail, was declared entitled to do so, and thereafter used it continuously. It built up a large circulation, of which about 9,000 copies were distributed daily through the second-class mail. In September, 1917, its publisher was directed to show cause "why the authorization of admission . . . to the second class mail matter . . . should not be revoked upon the following ground:

"The publication is not 'a newspaper or other periodical publication' within the meaning of the law governing mailable matter of the second class, it being in conflict with the provisions of the law embodied in section 481½ Postal Laws and Regulations."

---

[1] Criminal Code, § 211 (obscene matter, information concerning abortion); § 212 (obscene, libelous or threatening matter upon envelopes or postal cards); § 213 (matter concerning lotteries); § 215 (schemes to defraud); § 217 (poisons, insects, reptiles, explosives, intoxicating liquors); by Act of March 4, 1911, c. 241, § 2, 36 Stat. 1339, § 211 of the Criminal Code, *supra*, was amended to include matter of a character to incite arson, murder, or assassination; by Act of March 3, 1879, c. 180, § 15, 20 Stat. 359, matter violating copyright laws was excluded; by Act of July 31, 1912, c. 263, § 1, 37 Stat. 240, prize-fight films were excluded; by Act of March 3, 1917, c. 162, § 5, 39 Stat. 1069, advertisements and solicitations for orders for intoxicating liquors in prohibition States.

That section relates not specifically to the second-class mail; but to all mail. It recites the provisions of Title XII of the Espionage Act of June 15, 1917, c. 30, 40 Stat. 217, 230, which declares unmailable all letters, pictures, publications and things "in violation of any of the provisions" of that act, and prescribes fine and imprisonment as punishment for the use or attempt to use the postal service for the transmission of such unmailable matter.[1] On this notice to show cause the Third Assistant Postmaster General held the customary informal hearing. The publisher of The Milwaukee Leader had not been convicted by any court of violating the Espionage Law; and its representative denied that it had ever committed any act in violation of it. But the Third Assistant Postmaster General issued on October 3, 1917, to the postmaster at Milwaukee the instruction that The Milwaukee Leader "is not entitled to transmission in the mails at the second-class rates of postage because it appears from the evidence in possession of the Department that the publication is not a 'newspaper or other periodical publication' within the meaning of the law governing mailable matter of the second class, it being in conflict with the provisions of the law embodied in section 481½, Postal Laws and Regulations."

This determination and action were confirmed by the Postmaster General; and the postmaster at Milwaukee thereafter denied to the publication transmission at the rates provided by law for second-class mail. The order did not forbid to The Milwaukee Leader all use of the mails; nor did it limit in any way the use of the mail facilities; it merely revoked the so-called second-class mailing permit; and the effect of this was to impose a

---

[1] Like punishment is provided in all statutes referred to in note 1, p. 418, *supra* except that mailing matter violative of the copyright law is not punishable criminally. The maximum punishment for mailing prize-fight films is a fine of $1,000 and imprisonment for one year.

higher rate of postage on every copy of the newspaper thereafter mailed.

The return filed herein by the Postmaster General alleges that this order "involved the exercise of judgment and discretion on his part" and is "not subject to be reviewed, set aside, or controlled by a court of law;" but he gives this justification for his action:

"By representations and complaints from sundry good and loyal citizens of the United States and from personal reading and consideration of the issues of the said relator's publication, from the date of the declaration of war down to the time of service of the citation upon it; and the hearing granted in pursuance thereof, it seemed to this respondent, in the exercise of his judgment and discretion and in obedience to the duty on him reposed as well by the general statutes as by the special provisions of said Espionage Law, that the provisions of the latter act were systematically and continually violated by the relator's publication"

It thus appears that the Postmaster General, in the exercise of a supposed discretion, refused to carry at second-class mail rates all future issues of The Milwaukee Leader, solely because he believed it had systematically violated the Espionage Act in the past. It further appears that this belief rested partly upon the contents of past issues of the paper filed with the return and partly upon "representations and complaints from sundry good and loyal citizens," whose statements are not incorporated in this record and which do not appear to have been called to the attention of the publisher of The Milwaukee Leader at the hearing or otherwise. It is this general refusal thereafter to accept the paper for transmission at the second-class mail rates which is challenged as being without warrant in law.

In discussing whether Congress conferred upon the Postmaster General the authority which he undertook to exer-

407.                BRANDEIS, J., dissenting.

cise in this case, I shall consider, first, whether he would have had the power to exclude the paper altogether from all future mail service on the ground alleged; and second, whether he had power to deny the publisher the second-class rate.

*First.* Power to exclude from the mails has never been conferred in terms upon the Postmaster General. Beginning with the Act of March 3, 1865, c. 89, § 16, 13 Stat. 507, relating to obscene matter and the Act of July 27, 1868, c. 246, § 13, 15 Stat. 196, concerning lotteries, Congress has from time to time forbidden the deposit in the mails of certain matter. In each instance, in addition to prescribing fine and imprisonment as a punishment for sending or attempting to send the prohibited matter through the mail, it declared that such matter should not be conveyed in the mail, nor delivered from any post office nor by any letter carrier.[1] By § 6 of the Act of June 8, 1872, c. 335, 17 Stat. 285, (Rev. Stats., § 396), the Postmaster General was empowered to "superintend the business of the department, and execute all laws relative to the postal service." As a matter of administration the Postmaster General, through his subordinates, rejects matter offered for mailing, or removes matter already in the mail, which in his judgment is unmailable. The existence in the Postmaster General of the power to do this cannot be doubted. The only question which can arise is whether in the individual case the power has been illegally exercised.[2] But while he may

---

[1] Criminal Code, §§ 211, 212, 213, 217; Act of March 3, 1917, c. 162, § 5, 39 Stat. 1069; Espionage Act of June 15, 1917, c. 30, Title XII, 40 Stat. 230.

[2] Orders excluding individual issues of newspapers or periodicals because of unmailable matter contained therein were sustained in *Masses Publishing Co.* v. *Patten,* 246 Fed. Rep. 24; *Anderson* v. *Patten,* 247 Fed. Rep. 382. In *Post Publishing Co.* v. *Murray,* 230 Fed. Rep. 773; and *Brooklyn Daily Eagle* v. *Voorhies,* 181 Fed. Rep. 579, such orders were enjoined as being unwarranted by the facts. See also *Davis* v. *Brown,* 103 Fed. Rep. 909.

thus exclude from the mail specific matter which he deems of the kind declared by Congress to be unmailable, he may not, either as a preventive measure or as a punishment, order that in the future mail tendered by a particular person or the future issues of a particular paper shall be refused transmission.

Until recently, at least, this appears never to have been questioned and the Post Office Department has been authoritatively advised that the power of excluding matter from the mail was limited to such specific matter as upon examination was found to be unmailable and that the Postmaster General could not make an exclusion order operative upon future issues of a newspaper.

In 1890 Tolstoi's Kreutzer Sonata had been excluded from the mails as indecent. Certain newspapers began to publish the book in instalments and their position was referred to the Attorney General. He replied:

" . . . I do not see that it necessarily follows that every instalment of the story thus published is obscene, because the story as a whole is declared to be so. It may be, indeed, that one or more chapters of this story are entirely unexceptionable in character. If so, the exclusion, as unmailable, of newspapers containing them might involve serious consequences to yourself." (19 Ops. Atty. Gen. 667, 668.)

Again, in 1908, President Roosevelt asked the Attorney General if the law permitted him to deny the mails to an anarchist newspaper published in the Italian language in which appeared articles advocating the murder of the police force of Paterson and the burning of the city. The Attorney General advised him that such an article constituted a seditious libel (it has since been made criminal by statute, Act of March 4, 1911, c. 241, § 2, 36 Stat. 1339), and that "the Postmaster General (would) be justified in excluding from the mails any issue of any periodical, otherwise entitled to the privileges of second-class mail

matter, which shall contain any article containing a seditious libel and counseling such crimes as murder, arson, riot, and treason." (26 Ops. Atty. Gen. 555.)

But the Attorney General was careful to point out that the law gave no authority to exclude issues of the paper which should contain no objectionable matter:

"It must be premised that the Postmaster General clearly has no power to close the mails to any class of persons, however reprehensible may be their practices or however detestable their reputation; if the question were whether the mails could be closed to all issues of a newspaper, otherwise entitled to admission, by reason of an article of this character in any particular issue, there could be no doubt that the question must be answered in the negative" p. 565.

If such power were possessed by the Postmaster General, he would, in view of the practical finality of his decisions, become the universal censor of publications. For a denial of the use of the mail would be for most of them tantamount to a denial of the right of circulation. Congress has not granted to the Postmaster General power to deny the right of sending matter by mail even to one who has been convicted by a jury and sentenced by a court for unlawful use of the mail and who has been found by the Postmaster General to have been habitually using the mail for frauds or lotteries and is likely to do so in the future. It has, in order to protect the public, directed postmasters to return to the sender mail addressed to one found by the Postmaster General to be engaged in a scheme to defraud or in a lottery enterprise.[1] But beyond this Congress has never

[1] Revised Statutes, § 3929, as amended by Act September 19, 1890, c. 908, § 2, 26 Stat. 465, as amended by Act March 2, 1895, c. 191, § 4, 28 Stat. 964.

By § 2 of the Act of May 16, 1918, c. 75, 40 Stat. 554—enacted after this case had gone to judgment in the trial court—authority was conferred upon the Postmaster General to stop, in like manner, delivery

· deemed it wise, if, indeed, it has considered it constitutional, to interfere with the civil right of using the mail for lawful purposes.[1]

The Postmaster General does not claim here the power to issue an order directly denying a newspaper all mail service for the future.[2] Indeed, he asserts that the mail ·

of mail to a person whom he finds "upon evidence satisfactory to him" to be using the mails in violation of the Espionage Act.

[1] In the Sixty-third Congress, Third Session (1915) a bill, H. R. 20644, was introduced to deny absolutely the use of the mail to any person who, in the opinion of the Postmaster General, "is engaged or represents himself as engaged in the business of publishing any books or pamphlets of an indecent, immoral, scurrilous or libellous character." It was objected: The "bill would invest one man . . . with the power to destroy the business of a publisher without affording any opportunity for trial by jury, according to regular court practice. The punishment which may be inflicted upon a publisher by the Postmaster General under the provisions of this bill is most severe, absolutely depriving him of the privilege of using the United States mails, even for legitimate purposes. . . . Furthermore, this bill makes ˉ it possible for the Postmaster General to inflict what is practically a confiscatory penalty for an offence not clearly defined. . . . Under such circumstances as these it is not safe to leave to the decision of one man, after an *ex parte* investigation, a decision which will involve the freedom of the press. Trial by jury and a penalty inflicted for each specified act is the only safeguard against an arbitrary and tyrannical power." The bill failed of passage. Hearings before Committee on Post Office and Post Roads, February 1, 1915, On Exclusion of Certain Publications from the Mails, pp. 38, 39, 63rd Cong. 3d sess. See The Postal Power of Congress, by Lindsay Rogers, Johns Hopkins University Studies (1916, Series XXXIV, No. 2), pp. 158, 159.

[2] In a letter to Senator Bankhead the Postmaster General said:

"I will state generally with regard to the action of the Department · that no newspaper or periodical has been denied the privilege of the mails as such. Particular issues of certain publications have been found to contain matter which would interfere with the operation or success of the military or naval forces . . . etc., etc. . . . and therefore nonmailable under the act in question." Cong. Rec. Aug. 22, 1917, pp. 6851-6857. See also a letter to Mr. Moon, Chairman of the House Committee on Post Offices and Post Roads, House Report No. 109, 65th Cong., 1st sess. ·

is still open to the Milwaukee Leader upon payment of first, third or fourth-class rates. He contends however that in regard to second-class rates special provisions of law apply under which he may deny that particular rate at his discretion. This contention will now be considered.

*Second.* The second-class mail rate is confined to newspapers and other periodicals, which possess the qualifications and comply with the conditions prescribed by Congress.[1] In the present case the Postmaster General insists that by reason of alleged past violations of Title XII of the Espionage Act, two of the conditions had ceased to be fulfilled. His reasons are these: The Mail Classification Act of March 3, 1879, c. 180, 20 Stat. 358, provides by § 14, that a newspaper to be mailable at the second-class rates "must regularly be issued at stated intervals, as frequently

---

[1] Act of March 3, 1879, c. 180, § 14, 20 Stat. 359: "That the conditions upon which a publication shall be admitted to the second class are as follows:

First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

Second. It must be issued from a known office of publication.

Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications.

Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers; *Provided, however,* That nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

Act of August 24, 1912, c. 389, § 1, 37 Stat. 550, applying to publications of benevolent, professional, etc., societies, educational institutions, state boards, trade unions, etc.

Act of August 24, 1912, c. 389, § 2, 37 Stat. 553, requiring a sworn statement of the names of editors, owners, stockholders, bondholders, etc., and that all paid matter be plainly marked "advertisement." *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288.

as four times a year," and that it must be "originated and published for the dissemination of information of a public character." If any issue of a paper has contained matter violative of the Espionage Act, the paper is no longer "regularly issued"; and likewise it has ceased to be a paper "published for the dissemination of information of a public character."[1] The argument is obviously unsound. The requirement that the newspaper be "regularly issued" refers, not to the propriety of the reading matter, but to the fact that publication periodically at stated intervals must be intended and that the intention must be carried out. Similarly, the requirement that the paper be "published for the dissemination of information of a public character" refers not to the reliability of the information or the soundness of the opinions expressed therein, but to the general character of the publication. The Classification Act does not purport to deal with the effect of, or the punishment for, crimes committed through a publication. It simply provides rates and classifies the material which may be sent at the respective rates. The act says what shall

---

[1] In a letter to Senator Bankhead August 22, 1917, Cong. Rec. pp. 6851–6857, submitted at the argument, the Postmaster General said:

"For many (?) years this Department has held publications not to be 'regularly issued' in contemplation of law when any issue contained non-mailable matter; and when the second-class privilege has been withdrawn under such circumstances, the formal notice of withdrawal has contained the statement that the second-class privilege has been revoked on both the grounds stated."

In his report for the year ending June 30, 1918, the Postmaster General says, p. 46:

"In the administration of the law governing second-class matter it was again found necessary to revoke the second-class mail privilege of some publications for the reason that their contents consisted more or less of matter which was non-mailable under the Espionage and other laws, and which, therefore, removed them from the class of publications entitled to that privilege."

The statement is repeated in the Postmaster General's report for the year ending June 30, 1919. p. 25.

constitute a newspaper. Undoubtedly the Postmaster General has latitude of judgment in deciding whether a publication meets the definition of a newspaper laid down by the law, but the courts have jurisdiction to decide whether the reasons which an administrative officer gives for his actions agree with the requirements of the statute under which he purports to act. *Gegiow* v. *Uhl,* 239 U. S. 3; *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94. The fact that material appearing in a newspaper is unmailable under wholly different provisions of law can have no effect on whether or not the publication is a newspaper. Although it violates the law, it remains a newspaper. If it is a bad newspaper the act which makes it illegal and not the Classification Act provides the punishment.

There is, also, presented in brief and argument, a much broader claim in support of the action of the Postmaster General. It is insisted that a citizen uses the mail at second-class rates not as of right—but by virtue of a privilege or permission, the granting of which rests in the discretion of the Postmaster General. Because the payment made for this governmental service is less than it costs, it is assumed that a properly qualified person has not the right to the service so long as it is offered; and may not complain if it is denied to him. The service is called the second-class privilege. The certificate evidencing such freedom is spoken of as a permit. But, in fact, the right to the lawful postal rates is a right independent of the discretion of the Postmaster General. The right and conditions of its existence are defined and rest wholly upon mandatory legislation of Congress. It is the duty of the Postmaster General to determine whether the conditions prescribed for any rate exist. This determination in the case of the second-class rate may involve more subjects of enquiry, some of them, perhaps, of greater difficulty, than in cases of other rates. But the function of the Postmaster General is the

same in all cases. In making the determination he must, like a court or a jury, form a judgment whether certain conditions prescribed by Congress exist, on controverted facts or by applying the law. The function is a strictly judicial one, although exercised in administering an executive office.[1] And it is not a function which either involves or permits the exercise of discretionary power. The so-called permit is mere formal notice of his judgment, but indispensable to the publisher because without it the local postmaster will not transmit the publication at second-class rates. The same sort of permit is necessary for the same bulk service at first, third or fourth-class rates.[2] There is nothing, in short, about the second-class rate which furnishes the slightest basis in law for differentiating it from the other rates so far as the discretion of the Postmaster General to grant or withhold it is concerned.

*Third.* Such is the legislation of Congress. It clearly appears that there was no express grant of power to the Postmaster General to deny second-class mail rates to future issues of a newspaper because in his opinion it had systematically violated the Espionage Act in the past; and it seems equally clear that there is no basis for the conten-

[1] The orders of the Postmaster General excluding periodicals from second-class mail, sustained in *Houghton* v. *Payne*, 194 U. S. 88; *Bates & Guild Co.* v. *Payne*, 194 U. S. 106, and *Smith* v. *Hitchcock*, 226 U. S. 53; as well as the fraud orders sustained in *Public Clearing House* v. *Coyne*, 194 U. S. 497, and that with which the court refused to interfere by certiorari in *Degge* v. *Hitchcock*, 229 U. S. 162, involved merely decisions of this nature. In *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, his fraud order was set aside because wholly unwarranted by the facts.

[2] Under recent legislation a "permit" may be issued for either first, third or fourth-class mail. Under Act of April 28, 1904, c. 1759, § 2, 33 Stat. 429, 440, as amended by Act of May 18, 1916, c. 126, § 13, 39 Stat. 159, 162, and Act of April 24, 1920, c. 161, 41 Stat. 574, identical articles may be deposited in large quantities without stamps affixed and sent at first, third or fourth-class rates, according to their nature, by paying the postage in advance in cash in a lump sum.

tion that such power is to be implied. In respect to news-papers mailed by a publisher at second-class rates there is clearly no occasion to imply this drastic power.[1] For a publisher must deposit with the local postmaster, before the first mailing of every issue, a copy of the publication which is now examined for matter subject to a higher rate and in order to determine the portion devoted to advertis-ing. Act of March 3, 1879, c. 180, § 12, 20 Stat. 359; Act of October 3, 1917, c. 63, § 1101, 40 Stat. 327. If there is illegal material in the newspaper, here is ample opportu-nity to discover it and remove the paper from the mail. Indeed, of the four classes of mail, it is the second alone which affords to the postal official full opportunity of as-certaining, before deposit in the mail, whether that which it is proposed to transmit is mailable matter. But even if the statutes were less clear in this respect than they seem to me, I should be led to adopt that construction because of the familiar rule that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the lat-ter." *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408. For adoption of the construction urged by the Postmaster General would raise not only a grave question, but a "succession of constitutional doubts" as suggested in *Harriman* v. *Interstate Commerce Commission*, 211 U. S. 407, 422. It would in practice seriously abridge the free-

---

[1] In the one case where drastic preventive measures were considered necessary—in the case of the foreign language press—Congress granted discretionary power to the Postmaster General specifically and in plain terms. By Act of October 6, 1917, c. 106, § 19, 40 Stat. 425 (The Trading With The Enemy Act), it was provided that, until the end of the war, foreign language papers should be nonmailable unless a translation should have been previously filed with the local postmaster, but that the Postmaster General might at his discretion grant a permit to mail without such translation. This act applied to publications sent by any class of the mails.

dom of the press. Would it not also violate the First Amendment? It would in practice deprive many publishers of their property without due process of law. Would it not also violate the Fifth Amendment? It would in practice subject publishers to punishment without a hearing by any court. Would it not also violate Article III of the Constitution? It would in practice subject publishers to severe punishment for an infamous crime without trial by jury. Would it not also violate the Sixth Amendment? And the punishment inflicted—denial of a civil right—is certainly unusual. Would it also violate the Eighth Amendment? If the construction urged by the Postmaster General is rejected, these questions need not be answered; but it seems appropriate to indicate why the doubts raised by them are grave.

(a) The power to police the mails is an incident of the postal power. Congress may, of course, exclude from the mails matter which is dangerous or which carries on its face immoral expressions, threats or libels. It may go further and through its power of exclusion exercise, within limits, general police power over the material which it carries, even though its regulations are quite unrelated to the business of transporting mails. *In re Rapier*, 143 U. S. 110. *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288. As stated in *Ex parte Jackson*, 96 U. S. 727, 732: "The difficulty attending the subject arises, not from the want of power in Congress to prescribe regulations as to what shall constitute mail matter, but from the necessity of enforcing them consistently with rights reserved to the people, of far greater importance than the transportation of the mail." In other words, the postal power, like all its other powers, is subject to the limitations of the Bill of Rights. *Burton* v. *United States*, 202 U. S. 344, 371. Compare *Adair* v. *United States*, 208 U. S. 161. Congress may not through its postal police power put limitations upon the freedom of the press which if directly attempted would be unconstitu-

tional. This court also stated in *Ex parte Jackson,* that "Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." It is argued that although a newspaper is barred from the second-class mail, liberty of circulation is not denied; because the first and third-class mail and also other means of transportation are left open to a publisher. Constitutional rights should not be frittered away by arguments so technical and unsubstantial. "The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name." *Cummings* v. *Missouri,* 4 Wall. 277, 325. The Government might, of course, decline altogether to distribute newspapers; or it might decline to carry any at less than the cost of the service; and it would not thereby abridge the freedom of the press, since to all papers other means of transportation would be left open. But to carry newspapers generally at a sixth of the cost of the service and to deny that service to one paper of the same general character, because to the Postmaster General views therein expressed in the past seem illegal, would prove an effective censorship and abridge seriously freedom of expression.[1]

How dangerous to liberty of the press would be the

---

[1] See "Freedom of Speech" by Zechariah Chafee, Jr., pp. 105–109, 233–234; also p. 199: "A newspaper editor fears being put out of business by the administrative denial of the second-class mailing privilege much more than the prospect of prison subject to a jury trial." It has been uniformly held that a statute prescribing similar penalties for failure to observe its provisions or the order of a public service commission, although made after full hearing, is a deterrent so potent as to amount to a denial of the right to a judicial review, and operate as a taking of property without due process of law in violation of the Fourteenth Amendment. *Ex parte Young,* 209 U. S. 123, 147; *Missouri Pacific Ry. Co.* v. *Tucker,* 230 U. S. 340, 349; *Wadley Southern Ry. Co.* v. *Georgia,* 235 U. S. 651, 662; *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331, 337.

holding that the second-class mail service is merely a
privilege, which Congress may deny to those whose views
it deems to be against public policy is shown by the
following contention made in 1912 by the Solicitor General
in the *Lewis Case* (see Brief, pp. 46–47):

"A possible abuse of power is no argument against its
existence, but we may as well observe that a denial of
the mails to a paper because of its ownership or the views
held by its owners may well be illegal as having no re-
lation to the thing carried in the mails *unless the views
are expressed in the paper;* but *if such views are expressed
in the paper* Congress can doubtless exclude them, just
as Congress could now exclude all papers advocating
lotteries, prohibition, anarchy, or a protective tariff if a
majority of Congress thought such views against public
policy." (Italics in the original.) [1]

(b) The right which Congress has given to all properly
circumstanced persons to distribute newspapers and
periodicals through the mails is a substantial right.
*Hoover* v. *McChesney,* 81 Fed. Rep. 472; *Payne* v. *National
Railway Publishing Co.,* 20 App. D. C. 581; 192 U. S.
602. It is of the same nature as, indeed, it is a part of,
the right to carry on business which this court has been
jealous to protect against what it has considered arbitrary
deprivations. *Adair* v. *United States,* 208 U. S. 161;
*Coppage* v. *Kansas,* 236 U. S. 1; *Adams* v. *Tanner,* 244
U. S. 590; *Allgeyer* v. *Louisiana,* 165 U. S. 578. A law
by which certain publishers were unreasonably or ar-
bitrarily denied the low rates would deprive them of
liberty or property without due process of law; and it

---

[1] It was, perhaps, in reference to this contention that the court
said in closing its opinion in that case (p. 316): "We do not wish even
by the remotest implication to be regarded as assenting to the broad
contentions concerning the existence of arbitrary power through the
classification of the mails, or by way of condition embodied in the
proposition of the Government which we have previously stated."

would likewise deny them equal protection of the laws. Compare *Second Employers' Liability Cases*, 223 U. S. 1, 52–53. The court might hold that a statute which conferred upon the Postmaster General the power to do this, because of supposed past infractions of law, was unreasonable and arbitrary; particularly in respect to second-class mail which affords ample opportunity for preventing the transmission of unmailable matter; and hence obnoxious to the Fifth Amendment.

The contention that, because the rates are non-compensatory, use of the second-class mail is not a right but a privilege which may be granted or withheld at the pleasure of Congress, rests upon an entire misconception, when applied to individual members of a class. The fact that it is largely gratuitous makes clearer its position as a right; for it is paid for by taxation.[1]

(c) The order revoking the entry of The Milwaukee Leader to second-class mail was clearly a punitive, not a preventive measure; as all classes of mail except the second were, as the Postmaster General states, left open to it provided it had sufficient financial resources. Of

---

[1] This is true, although the deficit is covered directly, in large part, by profits on first-class mail. The net cost of this service to the Government was, before the World War, equal to one-tenth of its expenditures for all other than postal purposes. Compare *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288, 304, with 34.Statistical Abstract of the United States (1911), p. 656. The justification for this non-compensatory service lies in the belief that education in its broad sense—intellectual activity fostered through the dissemination of information and of ideas—is essential to the life of a free, self-governing and striving people. This non-compensatory service is comparable to many rendered by the Government, *e. g.*, to the facilitation of communication and commerce by port, canal, passport or consular services, for all of which only small charges, or none, are made.

That a Government furnishing public service must be judged by ordinary standards of public callings, see Chafee on Freedom of Speech, p. 109, citing H. J. Laski in 31 Harvard Law Review, 186, and Laski's Authority in the Modern State, p. 378.

the three left available, the third class, being for "miscellaneous printed matter," was an appropriate one for distributing newspapers and was the cheapest. But the additional cost to the publisher involved in distributing daily 9,000 copies by the third-class mail would be a very serious one. The actual and intended effect of the order was merely to impose a very heavy fine, possibly $150 a day, for supposed transgression in the past. But the trial and punishment of crimes is a function which the Constitution, Article III, § 2, cl. 3, entrusts to the judiciary.[1] I am not aware that any other civil administrative officer has assumed, in any country in which the common law prevails, the power to inflict upon a citizen severe punishment for an infamous crime. Possibly the court would hold that Congress could not, in view of Article III of the Constitution, confer upon the Postmaster General as a mere incident in the administration of his department, authority to issue an order which could operate only as a punishment. See *Wong Wing* v. *United States*, 163 U. S. 228, 235–237.

(d) The Sixth Amendment guarantees that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed and that he shall be confronted with the witnesses against him. It is only in the case of petty offences that the jury may be dispensed with. *Schick* v. *United States*, 195 U. S. 65, 68. What is in effect a very heavy fine has been imposed by the Postmaster General. It has been imposed because he finds that the publisher has committed the crime of violating the Espionage Act. And that finding is based in part upon "representations and complaints from sundry good and loyal citizens"

[1] Compare *Harbor Commissioners* v. *Redwood Co.*, 88 Cal. 491; *Cleveland, etc., Ry. Co.* v. *People*, 212 Ill. 638; *Langenberg* v. *Decker*, 131 Ind. 471; *In re Sims*, 54 Kan. 1.

with whom the publisher was not confronted. It may be that the court would hold, in view of Article Sixth in our Bill of Rights, that Congress is without power to confer upon the Postmaster General, or even upon a court, except upon the verdict of a jury and upon confronting the accused with the witnesses against him, authority to inflict indirectly such a substantial punishment as this. See *Callan* v. *Wilson,* 127 U. S. 540; *Thompson* v. *Utah,* 170 U. S. 343.

(e) The punishment inflicted is not only unusual in character; it is, so far as known, unprecedented in American legal history. Every fine imposed by a court is definite in amount.[1] Every fine prescribed by Congress is limited in amount. Statutes frequently declare that each day's continuation of an offence shall constitute a new crime. But here a fine imposed for a past offence is made to grow indefinitely each day—perhaps throughout the life of the publication. Already, having grown at the rate of say $150 a day, it may aggregate, if the circulation has been maintained, about $180,000 for the three years and four months since the order was entered; and its growth continues. It was assumed in *Waters-Pierce Oil Co.* v. *Texas* (No. 1), 212 U. S. 86, 111, that an excessive fine, even if definite, would violate the Eighth Amendment. Possibly the court, applying the Eighth Amendment, might again, as in *Weems* v. *United States,* 217 U. S. 349, 381, make clear the "difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice."

The suggestion is made that if a new application for entry to second-class mail had been made the publishers might have been granted a certificate. It is no bar to proceedings to set aside an illegal sentence, that an ap-

---

[1] Compare *Morris* v. *State,* 1 Blackf. (Ind.) 37, 38; *State* v. *Bennett,* 4 Dev. & B. (N. Car.) 43, 50; *Easterling* v. *State,* 35 Miss. 210.

plication to the Executive for clemency might have resulted in a pardon.

In conclusion I say again—because it cannot be stressed too strongly—that the power here claimed is not a war power. There is no question of its necessity to protect the country from insidious domestic foes. To that end Congress conferred upon the Postmaster General the enormous power contained in the Espionage Act of entirely excluding from the mails any letter, picture or publication which contained matter violating the broad terms of that act. But it did not confer— and the Postmaster General concedes that it did not confer—the vague and absolute authority practically to deny circulation to any publication which in his opinion is likely to violate in the future any postal law. The grant of that power is construed into a postal rate statute passed forty years ago which has never before been suspected of containing such implications. I cannot believe that in establishing postal classifications in 1879 Congress intended to confer upon the Postmaster General authority to issue the order here complained of. If, under the Constitution, administrative officers may, as a mere incident of the peace time administration of their departments, be vested with the power to issue such orders as this, there is little of substance in our Bill of Rights and in every extension of governmental functions lurks a new danger to civil liberty.

MR. JUSTICE HOLMES, dissenting.

I have had the advantage of reading the judgment of my brother Brandeis in this case and I agree in substance with his view. At first it seemed to me that if a publisher should announce in terms that he proposed to print treason and should demand a second-class rate it must be that the Postmaster General would have authority

to refuse it. But reflection has convinced me that I was wrong. The question of the rate has nothing to do with the question whether the matter is mailable, and I am satisfied that the Postmaster cannot determine in advance that a certain newspaper is going to be non-mailable and on that ground deny to it not the use of the mails but the rate of postage that the statute says shall be charged.

Of course the Postmaster may deny or revoke the second-class rate to a publication that does not comply with the conditions attached to it by statute, but as my brother Brandeis has pointed out, the conditions attached to the second-class rate by the statute cannot be made to justify the Postmaster's action except by a quibble. On the other hand the regulation of the right to use the mails by the Espionage Act has no peculiarities as a war measure but is similar to that in earlier cases, such as obscene documents. Papers that violate the act are declared non-mailable and the use of the mails for the transmission of them is made criminal. But the only power given to the Postmaster is to refrain from forwarding the papers when received and to return them to the senders. Act of June 15, 1917, c. 30, Title XII, 40 Stat. 217, 230. Act of May 16, 1918, c. 75, 40 Stat. 553, 554. He could not issue a general order that a certain newspaper should not be carried because he thought it likely or certain that it would contain treasonable or obscene talk. The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues, and it would take very strong language to convince me that Congress ever intended to give such a practically despotic power to any one man. There is no pretence that it has done so. Therefore I do not consider the limits of its constitutional power.

To refuse the second-class rate to a newspaper is to make its circulation impossible and has all the effect of

the order that I have supposed. I repeat. When I observe that the only powers expressly given to the Postmaster General to prevent the carriage of unlawful matter of the present kind are to stop and to return papers already existing and posted, when I notice that the conditions expressly attached to the second-class rate look only to wholly different matters, and when I consider the ease with which the power claimed by the Postmaster could be used to interfere with very sacred rights, I am of opinion that the refusal to allow the relator the rate to which it was entitled whenever its newspaper was carried, on the ground that the paper ought not to be carried at all, was unjustified by statute and was a serious attack upon liberties that not even the war induced Congress to infringe.