379 F.3d 716
 Carl A. CURRIER; David Bar; Willard Johnson; Seattle Housing and Resource Effort, a Washington non-profit corporation, individually and on behalf of others similarly situated, Plaintiffs-Appellants,
v.
John E. POTTER,* Postmaster General of the United States, individually and in his official capacity; Dale E. Zinser, Seattle District Manager of the United States Postal Service, individually and in his official capacity; United States Postal Service, Defendants-Appellees.
 No. 02-35232.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 7, 2003.
 Submission Withdrawn May 28, 2003.**
 Resubmitted July 27, 2004.
 Filed August 12, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David Girard and Casey Trupin (argued), Seattle, WA, for the plaintiffs-appellants.
 Robert D. McCallum, Assistant Attorney General, Barbara C. Biddle, and Irene M. Solet (argued), Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C.; John L. McKay, Jr., United States Attorney, Seattle, WA; Mary Anne Gibbons, General Counsel, David G. Karro, and Stephan J. Boardman, Attorneys, Civil Practice, United States Postal Service, Washington, D.C., for the defendants-appellees.
 Caroline M. Brown and Thomas W. Beimers, Washington, D.C.; Maria Foscarinis, Pallavi Rai, and Jeremy Rosen, Washington, D.C., for amicus curiae National Law Center on Homelessness & Poverty in support of the plaintiffs-appellants.
 Appeal from the United States District Court for the Western District of Washington; Robert S. Lasnik, District Judge, Presiding. D.C. No. CV-01-00156-RSL.
 Before O'SCANNLAIN, GOULD, Circuit Judges, and BOLTON,*** District Judge.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide various regulatory, statutory, and constitutional challenges to United States Postal Service policies regarding general delivery mail service and the provision of no-fee postal boxes to homeless persons.
 
 
 2
 * Carl Currier, David Bar, and Willard Johnson are homeless persons in Seattle, Washington. Lacking physical addresses, they have found it difficult to receive mail. Although some homeless shelters will accept mail on behalf of residents, they will only hold mail for a limited time and mail theft in shelters is a recurring problem. In May and June 2000, they inquired about three United States Postal Service (the "Postal Service") services: postal box rental, no-fee postal boxes, and general delivery. Under then-existing postal regulations, a person lacking a physical address who sought to rent a postal box had to provide a driver's license or a verifiable point of contact (such as a homeless shelter), or, alternatively, had to be known personally by the postmaster or box clerk. See Postal Bulletin 21877 at 7 (Sept. 29, 1994).
 
 [1]
 
 3
 No-fee postal boxes are available to customers who are ineligible for carrier delivery service. See Domestic Mail Manual D910.5.1(a) (Issue 55, Jan. 10, 2000).[2] For example, the Postal Service need not provide carrier services if an area has a low population density or a customer lives within a quarter-mile of a rural post office. No-fee boxes are unavailable in large cities such as Seattle because the Postal Service delivers mail to all physical addresses in the area.
 
 
 4
 General delivery service permits a person to receive mail addressed merely to his or her name, with the designation "General Delivery, [City Name]." In large cities with multiple branches, all general delivery mail is sent to one designated facility — in Seattle, the Main Post Office downtown. See id. M930.1.2 (Issue 57, June 30, 2002). The mail is held for pickup at a designated post office for thirty days. General delivery service is intended primarily to serve as a temporary means of delivery, although homeless persons may use the service indefinitely. See id. D930.1.1 (Issue 57, June 30, 2002);
 
 
 5
 These homeless persons experienced various difficulties when they attempted to take advantage of these services. The Postal Service denied Bar and Currier's request for postal box rental because they lacked physical addresses. Even after Currier submitted an identification card issued by a homeless shelter, he was still not permitted to rent a box. Johnson was allowed to rent a box after providing his driver's license. They were all told that they were ineligible for no-fee postal boxes and that they could receive general delivery service only at the Main Post Office.
 
 
 6
 Aided by a homeless-advocacy group, Seattle Housing and Resource Effort ("SHARE"), Currier, Bar, and a third homeless person, James Kerns (not a party to this appeal), filed petitions with the Postal Service challenging the denial of these services. An Administrative Law Judge ("ALJ") held that under the governing postal regulations they were properly denied no-fee boxes and that the Postal Service was not required to provide general delivery at locations other than the Main Post Office in downtown Seattle. The ALJ also denied Currier's petition for postal box rental because Currier refused to use the address listed on his identification card as a point of contact and the card itself lacked a signature as required by postal regulations. The ALJ's decision became the final administrative decision when Currier failed to appeal it within the Postal Service.
 
 
 7
 Currier, Bar, and Johnson (hereinafter collectively "Currier") then brought suit against the Postal Service and former and current postal officials in the Western District of Washington.[3] Currier alleged violations of certain postal regulations;
 
 [4]
 
 8
 the Postal Reorganization Act ("PRA"), 39 U.S.C. § 101 
 
 
 9
 et seq.;
 
 
 10
 the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706; the First Amendment's Free Speech Clause; and the Fifth Amendment's Due Process Clause (incorporating the Fourteenth Amendment's Equal Protection Clause), and sought monetary damages as well as declaratory and injunctive relief.

 
 
 11
 The Postal Service moved to dismiss the action for lack of subject-matter jurisdiction and for failure to state a claim. Currier in turn filed motions for a preliminary injunction and class certification. The district court granted the Service's motion to dismiss and denied Currier's motions as moot. Currier timely appealed.
 
 II
 
 12
 We first examine some complex jurisdictional issues, including whether sovereign immunity has been waived by the government and to what extent judicial review of administrative action may be available at all.
 
 
 13
 The district court held that "there is no waiver of immunity, no substantive legal basis and no jurisdiction over claims asserted under Postal Service regulations." Currier v. Henderson, 190 F.Supp.2d 1221, 1227 (W.D.Wash.2002). The court also dismissed the claims brought under the APA, explaining that the PRA exempted the Postal Service from APA review. Id. at 1228.
 
 
 14
 * Currier contends that the district court erred in concluding that the Postal Service was entitled to sovereign immunity and that it lacked subject-matter jurisdiction over the Service's alleged violation of the no-fee box regulation. The Postal Service responds by arguing that Currier possesses no private right of action to challenge postal regulations, as required by the Supreme Court's recent decision in United States Postal Service v. Flamingo Industries (USA) Ltd., 540 U.S. 736, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004).[5]
 
 
 15
 The Supreme Court reminded us in Flamingo that the two-step analysis first set out in FDIC v. Meyer, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), governs inquiries into the Postal Service's amenability to suit. See Flamingo, 540 U.S. at ___, 124 S.Ct. at 1327. In Meyer, the Court explained that
 
 
 16
 The first inquiry is whether there has been a waiver of sovereign immunity. If there has been such a waiver ... the second inquiry comes into play — that is, whether the source of substantive law upon which the claimant relies provides an avenue for relief.
 
 
 17
 Meyer, 510 U.S. at 484, 114 S.Ct. 996. Here, the parties do not dispute that 39 U.S.C. § 401(1)[6] enacts a broad waiver of sovereign immunity for the Postal Service. We must therefore decide whether Currier has a private right of action to obtain relief.
 
 
 18
 Currier urges various sources of substantive law. First, he contends that the no-fee box regulation itself comprises "the substantive law ... intended to reach the federal entity," in the formulation of the Flamingo Court. Flamingo, 540 U.S. at ___, 124 S.Ct. at 1327. Because the PRA and its implementing regulations are by definition directed at the Postal Service, he explains, Congress did not intend to exempt the Service from judicial review under them. Second, Currier argues that 39 U.S.C. § 409(a) — which declares that "district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service" — confers a cause of action for violations of postal regulations. And finally, citing People's Gas, Light & Coke Co. v. United States Postal Service, 658 F.2d 1182 (7th Cir.1981), he asserts that, even though the PRA broadly proscribes APA review of the Service's actions, the statute nevertheless permits "APA-like" judicial review of regulatory claims.
 
 
 19
 We are not persuaded that Congress, by enacting the PRA, intended to subject the Postal Service to suit for violations of regulations. "[A]dopted to increase the efficiency of the Postal Service and reduce political influences on its operations," see Flamingo, 540 U.S. at ___, 124 S.Ct. at 1325, the PRA converted the Postal Department into a rara avis: "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. While preserving the Service's public obligations, the Act "indicated that [Congress] wished the Postal Service to be run more like a business than had its predecessor, the Postal Department." Franchise Tax Bd. v. United States Postal Serv., 467 U.S. 512, 519-20, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984). Consistent with that goal, the Supreme Court has liberally construed 39 U.S.C. § 401(1)'s sue-or-be-sued clause, "presum[ing] that the Service's liability is the same as that of any other business." Id. at 520, 104 S.Ct. 2549.
 
 
 20
 At the same time, the PRA provides that various forms of federal law, including the APA, that normally apply to government entities do not apply to the Service. See 39 U.S.C. § 410(a). Thus, the Service is exempt from the APA's general mandate of judicial review of agency actions. Given this statutory backdrop, we are satisfied that the PRA evinces Congress's general intent to withdraw judicial scrutiny of postal regulations. See Block v. Cmty. Nutrition Inst., 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); Ruff v. Hodel, 770 F.2d 839, 840 (1985). In the face of such clear evidence, we also decline to override the PRA's express removal of APA review of the Service's actions by imputing an implicit Congressional intent to preserve common-law principles of judicial review. Cf. Carlin v. McKean, 823 F.2d 620, 623 (D.C.Cir.1987) (suggesting without deciding that common-law administrative review may not survive PRA's explicit removal of APA review).
 
 
 21
 We have previously observed, moreover, that § 409(a) itself "does not confer subject matter jurisdiction for actions in which the Service is a party, but requires a `substantive legal framework' of federal law to confer federal subject matter jurisdiction." Janakes v. United States Postal Serv., 768 F.2d 1091, 1093 (9th Cir.1985). We find that a substantive legal framework is lacking here. As a regulation, the no-fee box policy does not create a private right of action of its own force. As the Supreme Court explained in Cort v. Ash:
 
 
 22
 In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose especial benefit the statute was enacted — that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 23
 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (internal quotation and citations omitted). The Court has further emphasized that the second and third factors are determinative: "Unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." Northwest Airlines, Inc. v. Transp. Workers Union of Am., 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981).
 
 
 24
 Given Congress's intent to insulate the Postal Service from administrative challenges and to place the Service on a business like footing, we are satisfied that the second and third factors militate against our inferring a private right of action under the no-fee box regulation. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 145, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (concluding that "legislative intent and consistency with the legislative scheme" trumped other factors' support for implied right of action); In re Wash. Pub. Power Supply Sys. Sec. Litig., 823 F.2d 1349, 1354 (9th Cir.1987) ("Even if the first factor were satisfied, we find that plaintiffs have failed to clear the second and third Cort v. Ash hurdles [.]"). We therefore conclude that the district court properly dismissed Currier's claim that the Service violated its no-fee box regulation for lack of subject-matter jurisdiction.
 
 B
 
 25
 In contrast to Currier's regulatory challenge, the district court concluded that it possessed jurisdiction to consider Currier's claim under 39 U.S.C. § 403(c), which prohibits the Service from "mak[ing] any undue or unreasonable discrimination among users of the mails."[7] And we agree that the application of the Cort v. Ash factors counsels in favor of inferring a private right of action in § 403(c). As the district court correctly noted, this provision was intended to benefit consumers such as Currier, and Congress was particularly concerned with preventing the Postal Service from engaging in unreasonable discrimination. See Currier, 190 F.Supp.2d at 1228 n. 10; see also H.R.Rep. No. 91-1104 (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3682 (explaining that § 403(c) "enjoins the Postal Service from unduly or unreasonably discriminating among users or granting undue or unreasonable preferences in providing services[.]"). A private right of action alleging unreasonable discrimination under § 403(c) is therefore "consistent with the underlying purposes of the legislative scheme [.]" Cort, 422 U.S. at 78, 95 S.Ct. 2080. We therefore conclude that the district court properly exercised subject-matter jurisdiction over Currier's statutory claim.
 
 C
 
 26
 The Postal Service does not dispute that the district court had jurisdiction over Currier's constitutional claims, see Meyer, 510 U.S. at 483, 114 S.Ct. 996, whose merits we now turn to consider.
 
 III
 
 27
 Currier challenges the Postal Service's general delivery and no-fee postal box regulations on First Amendment and equal protection grounds. He asserts that the Service's provision of general delivery mail service at only Seattle's Main Post Office — rather than at the 32 branch offices in the greater Seattle area — violates homeless persons' First Amendment right to receive mail. By forcing those homeless persons who depend on general delivery to receive mail only at the Main Post Office, the general delivery regulation also violates the equal protection guarantees incorporated in the Fifth Amendment's Due Process Clause. Similarly, Currier contends that the no-fee postal box regulation breaches both the First Amendment and equal protection because some people who are ineligible for carrier delivery are given free postal boxes, while the homeless, who are also ineligible for carrier delivery, are not.
 
 
 28
 * It is axiomatic that restrictions upon the mail system implicate the First Amendment. As the Supreme Court stated in Blount v. Rizzi, "The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues...." 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (quoting U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson, 255 U.S. 407, 437, 41 S.Ct. 352, 65 L.Ed. 704 (1921)) (Holmes, J., dissenting) (alteration in original); see also Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 80, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (Rehnquist, J., concurring in the judgment) ("A prohibition on the use of the mails is a significant restriction of First Amendment rights."). The Court has not limited constitutional protection to those who seek to send mail; recipients of mail also have enforceable First Amendment rights. See Lamont v. Postmaster Gen., 381 U.S. 301, 307, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (holding that requiring recipient to request in writing that "communist political propaganda" be delivered to him was an "unconstitutional abridgment of the addressee's First Amendment rights."); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (acknowledging a First Amendment right to receive mailed advertising). We must therefore decide whether the burden on Currier's First Amendment rights here rises to the level of a constitutional violation.
 
 
 29
 Our inquiry consists of the traditional tripartite forum analysis: we must first determine the relevant forum in which Currier seeks to exercise his First Amendment rights; then decide whether the forum is public or nonpublic in nature; and, finally, we must apply the appropriate level of scrutiny as dictated by the nature of the forum. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).
 
 
 30
 * Although speech forum analysis is most commonly applied to the government's physical property, the Supreme Court has endorsed its use in considering fora defined "more in a metaphysical than in a spatial or geographic sense." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (reimbursement program for student publication costs a limited public forum); see also Cornelius, 473 U.S. at 801, 105 S.Ct. 3439 (charitable contribution program a nonpublic forum); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 48-49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal school mail system a non-public forum). In this case, Currier's First Amendment claims depend on the existence of a similarly metaphysical forum.
 
 
 31
 Currier argues that the relevant forum is the mail system as a whole. However, we are mindful of the Supreme Court's admonition that, while the "nature and function" of the system should not be ignored, courts should "focus[ ] on the access sought by the speaker" and not the system in general. See Cornelius, 473 U.S. at 801-02, 105 S.Ct. 3439. Here, Currier seeks greater access to the general delivery mail system, contending that the service should be offered at branch post offices. Thus, the relevant forum is appropriately limited to the general delivery service, not the mail system as a whole. See id. at 801, 105 S.Ct. 3439 (charitable campaign rather than federal workplace was forum where plaintiffs sought to be listed in campaign); United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 128, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (letterbox constituted relevant unit of forum analysis where plaintiffs sought to place unstamped handbills in letterboxes).
 
 2
 
 32
 The next inquiry is whether general delivery service is a public or nonpublic forum.
 
 
 33
 * The Supreme Court has delineated three categories of fora. Traditional public fora comprise those areas — such as streets and parks — that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry, 460 U.S. at 45, 103 S.Ct. 948 (internal quotation and citation omitted). The Court has been reluctant to extend the concept to new contexts, "reject[ing] the view that traditional public forum status extends beyond its historic confines." Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); see also United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 206, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (refusing to declare Internet access in a public library either a traditional or designated public forum). The government's ability to proscribe speech in a public forum is "sharply circumscribed." Perry, 460 U.S. at 45, 103 S.Ct. 948. A content-based exclusion requires a showing "that [the government's] regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. Content-neutral restrictions are reviewed under the traditional time, place, and manner test, and are thus permissible if they are "narrowly drawn to serve a significant government interest, and leave open ample channels of communication." Id.
 
 
 34
 Designated or limited public fora[8] are sites created by the government's express dedication of its property to expressive conduct. Id. at 45-46, 103 S.Ct. 948. Such fora cannot be created by inaction, but only by an intentional governmental act. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. The government may limit the forum to certain groups or subjects — although it may not discriminate on the basis of viewpoint — and may close the fora whenever it wants. See Perry, 460 U.S. at 46, 103 S.Ct. 948. As long as the government maintains the open character of the forum, it is subject to the same constitutional strict scrutiny that must be applied to traditional public fora. See id.
 
 
 35
 If a forum does not fit into either of the two public categories, it is a nonpublic forum. In a nonpublic forum, our scrutiny is less exacting: "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speakers's view." Id. at 46, 103 S.Ct. 948. Such sparing treatment stems from the oft-recognized principle that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." Id. (quoting Greenburgh, 453 U.S. at 129, 101 S.Ct. 2676); see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); United States v. Kokinda, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality op.).
 
 
 36
 b
 
 
 37
 Currier argues that the mail system as a whole — and, by implication, its general delivery system — is a traditional public forum. The Postal Service responds that the general delivery service is most akin to a nonpublic forum.
 
 
 38
 The Supreme Court has resisted extending traditional public forum status beyond historic confines. See Forbes, 523 U.S. at 678, 118 S.Ct. 1633. We see no indication that general delivery mail service should stand as the equivalent of "quintessential public forums" like parks or streets. See Perry, 460 U.S. at 45, 103 S.Ct. 948. We are satisfied that, as a form of mail delivery whose particular function is to serve transient persons, general delivery lacks the hallowed history as a crucible of unfettered public debate necessary to establish traditional public forum status. See Am. Library Ass'n, 539 U.S. at 206, 123 S.Ct. 2297 ("The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking."). Given that the Court has noted that the government could eliminate postal service altogether if it so wished, see Blount, 400 U.S. at 416, 91 S.Ct. 423, we hesitate to declare a particular form of delivery a traditional public forum.
 
 
 39
 We are similarly reluctant to conclude that general delivery service is a limited public forum. To be sure, general delivery service can serve as medium for expressive activity: it is open to all members of the public without restriction and operates without regard to content or viewpoint. Nevertheless, we do not find that the Postal Service has here made "an affirmative choice to open up its property for use as a public forum." Am. Library Ass'n, 539 U.S. at 206, 123 S.Ct. 2297. Unlike the limited public forum created by the university's student publication reimbursement program in Rosenberger, general delivery was not set up to "encourage a diversity of views from private speakers." Rosenberger, 515 U.S. at 834, 115 S.Ct. 2510; see also Cornelius, 473 U.S. at 805, 105 S.Ct. 3439 ("The Government did not create the[Combined Federal Campaign] for purposes of providing a forum for expressive activity. That such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes."). Instead, the Service's provision of general delivery service is meant merely to facilitate temporary mail delivery to a limited class of users.
 
 
 40
 Our conclusion that general delivery is a nonpublic forum is bolstered by our review of the Supreme Court's case law. In Perry, the Court concluded that teacher mailboxes in a school district's interschool mail system were not a public forum, and that the district could therefore validly exclude unions other than the teachers' exclusive bargaining representative from using the system. See Perry, 460 U.S. at 46, 103 S.Ct. 948. The Greenburgh Court rejected the claim that residential letter-boxes were a limited public forum. See Greenburgh, 453 U.S. at 128, 101 S.Ct. 2676. And in Kokinda, a plurality of the Court found that a sidewalk had not been dedicated to expressive activity by the Postal Service. See Kokinda, 497 U.S. at 729-30, 110 S.Ct. 3115. We have similarly found postal sidewalks to be nonpublic fora in Jacobsen v. United States Postal Serv., 993 F.2d 649, 656 (9th Cir.1992), and Monterey County Democratic Cent. Comm. v. United States Postal Serv., 812 F.2d 1194, 1198 (9th Cir.1987). Viewed against this backdrop, we are satisfied that general delivery — a functional method of mail delivery — is a nonpublic forum.
 
 3
 
 41
 When a forum is nonpublic, we review government-imposed restrictions under a reasonableness standard. "The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original). But the government may not "restrict speech in whatever way it likes." Forbes, 523 U.S. at 682, 118 S.Ct. 1633. Such restrictions cannot "be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." Id.
 
 
 42
 Here, the Postal Service's decision to offer general delivery service at only one location is content- and viewpoint-neutral, applying to all customers equally. The Service contends that general delivery mail must be hand-sorted and requires a transaction with a person at the counter; thus, offering general delivery service at branch offices would overburden those offices' personnel. The Postal Service further asserts that the system would be cumbersome and inefficient given the number of branch offices and zip codes at issue. Cf. Kokinda, 497 U.S. at 731, 110 S.Ct. 3115 (Postal Service regulation limiting solicitation on postal sidewalks was reasonable in view of Service's interest in efficient mail delivery); Cornelius, 473 U.S. at 809, 105 S.Ct. 3439 (holding that limiting participation in federal charitable campaign was reasonable in order to minimize disruption in workplace); Monterey County, 812 F.2d at 1199 (Postal Service guideline prohibiting voter registration on post office sidewalks was reasonable in view of Service's interest in avoiding appearance of involvement in political process). In light of these concerns and general delivery's purpose as a temporary means of delivery, we conclude that the Service's confinement of general delivery to a single Seattle location is reasonable.[9]
 
 B
 
 43
 Currier also brings a First Amendment challenge to the Postal Service's former and current no-fee postal box regulations.[10] The former regulation made available a no-fee box to a customer ineligible for carrier delivery service "whose physical residence or business location is within the geographical delivery ZIP code boundaries administered by" a post office providing city carrier delivery. Domestic Mail Manual D910.5.1(a) (Issue 55, Jan. 10, 2000). The current regulation, revised to take into account increased security concerns, specifically requires a customer to have a physical address in order to be eligible for a no-fee box. See Domestic Mail Manual D910.5.2 (Issue 57, June 30, 2002).
 
 
 44
 Because Currier seeks access to a no-fee postal box, we evaluate such boxes as the relevant fora. See Greenburgh, 453 U.S. at 128, 101 S.Ct. 2676. We are satisfied that no-fee boxes, like general delivery service, are nonpublic fora. In Greenburgh, the Supreme Court explained that residential letterboxes are non-public fora, noting that merely because "an instrumentality `is used for the communication of ideas or information' "does not make it a public forum. Id. at 130 n. 6, 101 S.Ct. 2676. Here, no-fee postal boxes constitute a similar instrumentality.
 
 
 45
 The Postal Service's restrictions on the provision of no-fee boxes are content- and viewpoint-neutral. It points out, moreover, that no-fee boxes are intended to serve persons in areas with low population density and are thus unavailable in large cities such as Seattle, where the Postal Service delivers mail to all physical addresses in the area. It further contends that the cost of providing no-fee boxes to all homeless persons would be substantial. Given these cost concerns and the Service's statutory mandate to provide efficient, economical service, its decision to provide no-fee boxes only to those customers who have physical addresses but are ineligible for carrier service is reasonable. Our conclusion is bolstered by the Supreme Court's clear dismissal of the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." Regan v. Taxation With Representation of Wash., 461 U.S. 540, 546, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (internal quotation and citation omitted); see also Lyng v. UAW, 485 U.S. 360, 369, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (holding that federal government is not required by First Amendment to subsidize employee's right to express pro-union sentiments by permitting striking worker to receive food stamps); Greenburgh, 453 U.S. at 126-27, 101 S.Ct. 2676 (rejecting contention that the "First Amendment guarantees [plaintiffs] the right to deposit, without payment of postage, their notices, circulars, and flyers in letterboxes") (emphasis added). The Service is not constitutionally obligated to provide no-fee boxes to homeless persons.
 
 C
 
 46
 Currier further contends that the general delivery and no-fee box regulations offend equal protection.[11] The Postal Service's refusal to offer general delivery service at branch offices in the zip codes where the homeless reside, he argues, singles out the homeless for discriminatory treatment. And by failing to provide no-fee boxes to the homeless while simultaneously offering them to other customers ineligible for carrier delivery, it impermissibly discriminates against homeless customers.
 
 
 47
 Given our conclusion that the regulations do not violate the First Amendment, however, Currier's equal protection challenge must fail. As we have explained: "[T]he viability of equal protection claims relating to expressive conduct is contingent on the existence of a public forum. Only when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged." Monterey County, 812 F.2d at 1200 (citing Perry, 460 U.S. at 54-55, 103 S.Ct. 948). Because no fundamental right of access has been violated here, we evaluate whether the regulations "rationally further a legitimate public purpose." Id. (internal quotation omitted). And our rational-basis review is quite limited: "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology, 228 F.3d 1043, 1051 (9th Cir.2000) (internal quotation and citation omitted).
 
 
 48
 In this case, the Postal Service's limitation of general delivery service is a rational response to the inefficiencies and increased costs that would result from expanding general delivery to branch offices. Cf. Greenburgh, 453 U.S. at 133, 101 S.Ct. 2676 (Postal Service's concern with maintaining efficient operations provided reasonable basis for denying First Amendment claim). Similarly, the Service's cost-driven decision to offer no-fee boxes only to customers with physical addresses who are denied carrier service is a reasonable attempt to eliminate some disparities between customers who receive carrier delivery and those who do not. See Geduldig v. Aiello, 417 U.S. 484, 495, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) (state may properly choose partly to remedy problem); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (equal protection does not require government to "attack[ ] every aspect of a problem"). We are therefore satisfied that the Service's regulations do not violate equal protection.[12]
 
 IV
 
 49
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Pursuant to Fed. R.App. P. 43(c)(2), John E. Potter is substituted for his predecessor, William J. Henderson
 
 
 **
 The panel withdrew submission in this case when the United States Supreme Court granted certiorari inUnited States Postal Service v. Flamingo Industries (USA) Ltd. on May 27, 2003, 538 U.S. 1056, 123 S.Ct. 2215, 155 L.Ed.2d 1104. Following the Court's decision on February 25, 2004, 540 U.S. 736, 124 S.Ct. 1321, 158 L.Ed.2d 19, the panel ordered the parties on March 16, 2004, to file supplemental briefs addressing the effect of Flamingo.
 
 
 ***
 The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The regulation has since been changed to require an applicant to have a verifiable point of contact even if he or she provides proper identification or is known to the postmaster or box clerkSee Postal Bulletin 22060 at 89 (Oct. 4, 2001).
 
 
 [2]
 The regulation has since been changed to require the customer seeking a no-fee box to have a physical addressSee Domestic Mail Manual D910.5.2 (Issue 57, June 30, 2002).
 
 
 [3]
 The district court dismissed the suit against the postal officers,see Currier v. Henderson, 190 F.Supp.2d 1221, 1225 (W.D.Wash.2002), and Currier does not appeal from that decision.
 
 
 [4]
 Specifically, Currier alleged that the Postal Service failed to comply with its no-fee postal box regulation,see Domestic Mail Manual D910.5.1(a) (Issue 55, Jan. 10, 2000), and its postal box rental regulation, see Postal Bulletin 21877 at 7 (Sept. 29, 1994). On appeal, Currier only briefed the former claim, and his counsel conceded at oral argument that Currier no longer advanced the latter claim, which we therefore deem waived. See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir.2004).
 
 
 [5]
 The Service alternatively characterizes Currier's regulatory claim as a challenge implicating postal rates and classifications on a national scale, which is subject to the exclusive adjudicative scheme embodied in 39 U.S.C. § 3628. That scheme required that Currier pursue his claims through administrative proceedings before the Postal Rate Commission,see id. § 3624(a), then bring a challenge in a court of appeals, see id. § 3628. Currier does not seek, however, to overturn the Postal Service Board of Governors' rate determination — governed by the procedure set forth in § 3628 — but rather challenges the Service's application of its eligibility restrictions for no-fee boxes to him. We therefore disagree with the Postal Service's alternative characterization of Currier's challenge.
 
 
 [6]
 The provision permits the Postal Service "to sue and be sued in its official name." 39 U.S.C. § 401(1)
 
 
 [7]
 The provision reads in full: "In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." 39 U.S.C. § 403(c)
 
 
 [8]
 The terms can be employed interchangeablySee Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510; Am. Library Ass'n, 539 U.S. at 206-07, 123 S.Ct. 2297, 156 L.Ed.2d 221; Kaplan v. County of Los Angeles, 894 F.2d 1076, 1080 (9th Cir.1990).
 
 
 [9]
 We note that Currier essentially brings a facial challenge to the general delivery regulation, asserting that the Service's refusal to offer general delivery at branch offices violates homeless persons' First Amendment right to receive mailSee Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir.1998) (discussing differences between facial and as-applied challenges). In rejecting this broad claim, we express no opinion regarding whether relief might be appropriate upon an individual plaintiff's affirmative demonstration that the regulation as applied to his individual circumstances effectively bars him from receiving mail at the sole general delivery location.
 
 
 [10]
 The district court considered both regulations in rejecting Currier's First Amendment challengeSee Currier, 190 F.Supp.2d at 1230 n. 14.
 
 
 [11]
 The Fifth Amendment's Due Process Clause embodies the protections of the Fourteenth Amendment's Equal Protection ClauseSee Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
 
 
 [12]
 Currier's statutory claim under 39 U.S.C. § 403(c) essentially rehashes his equal protection challenge, contending that the Service's regulations unreasonably discriminate against the homeless. However, the statute expressly contemplates that the Service will make reasonable distinctions among users of the mail systemSee UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 624 (3d Cir.1995); Egger v. United States Postal Serv., 436 F.Supp. 138, 142 (W.D.Va.1977); see also Grover City v. United States Postal Serv., 391 F.Supp. 982, 986 (C.D.Cal.1975) ("The Postal Service's delivery regulations are not unreasonably discriminatory because the distinctions made by the regulations are reasonably related to the effectuation of the pertinent objectives of the Postal Reorganization Act, which are provision of efficient mail delivery services at reasonable costs."). Because we conclude that the challenged regulations are rationally justified and thus do not violate equal protection, we are satisfied that the Service has also not breached its statutory mandate.
 
 
 
 50
 GOULD, Circuit Judge, concurring in part and dissenting in part:
 
 
 51
 I concur in the judgment in this case, and I join Judge O'Scannlain's opinion except as to Parts III.A and III.B. I write separately first to express my view that the First Amendment challenge to the Post Office's delivery policies should be considered under at least the limited public forum doctrine. Nonetheless, even under that doctrine, I reject the Appellants' facial challenge to the Post Office's delivery policies. I also write separately to discuss an issue that we do not reach, one that the Appellants did not advance and that the majority opinion explicitly leaves open in its footnote nine. This deferred issue is whether the Post Office's general delivery regulations are constitutionally permissible if, in application to an individual person, they substantially burden that person's right to receive mail. This issue will squarely arise in an "as applied" challenge asserted by a homeless person who demonstrates an inability reasonably to gain access to general delivery mail at the main Post Office branch.
 
 
 52
 That a segment of citizens of our great country are left by the struggles of life with no home is unfortunate, to say the very least, but the struggles of the homeless neither detract from their character nor limit their right to exercise freedoms guaranteed by the Constitution. The right to receive mail is a fundamental aspect of the freedom of speech secured by the First Amendment. We recognize this important principle today, although we reject the facial constitutional challenge to the Post Office's general delivery system.
 
 
 53
 Notwithstanding our recognition of the right to receive mail, I am left with the impression that some homeless persons now living in the greater Seattle area cannot travel to Seattle's main post office without undue burden to retrieve general delivery mail because jobs, disabilities, or other circumstances prevent their travel. I agree with the majority that this issue is not squarely raised as the case was framed by the complaint and the proceedings on appeal. Yet, the issue warrants an expression of my views that may assist the Postal Service and the parties litigating for adequate procedures for the homeless.
 
 
 54
 The crux of the problem, as I see it, is that the United States Postal Service's current limitations on general delivery mail do not permit homeless persons to apply for general delivery at branch post offices under any condition whatsoever, even in cases of undue hardship. This unyielding policy unreasonably and substantially impairs the ability of some homeless persons to receive mail and to exercise their First Amendment rights. Nothing further can be declared in this case. But in an appropriate case, I would hold that, although the Post Office need not routinely make general delivery available at all branch post offices for all persons who are homeless, the Postal Service's regulations, to comply with the First Amendment, must make due provision for general delivery to a homeless person at a branch office when that person has shown undue hardship in retrieving mail at the main post office.
 
 
 55
 * * *
 
 
 56
 The right to receive mail is protected by the First Amendment. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (holding unconstitutional under the First Amendment a law that burdened the individual's receipt of mail). The right to receive and send mail through the postal system is "almost as much a part of free speech as the right to use our tongues." Id. at 305, 85 S.Ct. 1493 (quoting Justice Holmes' dissent in United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 255 U.S. 407, 437, 41 S.Ct. 352, 65 L.Ed. 704 (1921)). Before the telegraph, telephone, electronic mail, and hand-held communication devices, there was mail — a bedrock of communication. Linking the government to the people, the mail system was at its inception "to many citizens across the country the most visible symbol of national unity." United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 122, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).
 
 
 57
 When our Constitution was first penned, the Framers recognized the importance of mail delivery and gave Congress explicit power to create a national postal system. U.S. Const. Art. I, § 8, cl. 7. A federal postal system was developed, and as the nation grew it built roads, canals, and railroads to facilitate mail delivery. From inception of our nation to the present, the delivery of the mail has been a foundation of our civilization, of our discourse as a people, of our economic well-being, and of our communications for family and leisure purposes.
 
 
 58
 At the forefront of its mandate to the Postal Service, Congress recognized the power of the post to connect government to people, people to government, and people to people:
 
 
 59
 The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.
 
 
 60
 39 U.S.C. § 101(a).
 
 
 61
 Because plaintiffs, a class of homeless persons living in the City of Seattle, do not have a physical address, they cannot benefit from the typical carrier delivery service. Also, without a physical address plaintiffs cannot, under Postal Service regulations, obtain a post office box even for a fee. The homeless are left to depend on the Postal Service's general delivery service if they are ever to receive mail. And even though the City of Seattle covers eighty-four square miles, general delivery service is now available only at the main post office in downtown Seattle during limited business hours. Moreover, the policy of providing general delivery service at only one location is applied without regard to where the recipients of general delivery mail might live, their financial status, or, perhaps most importantly, their ability to travel to the downtown post office during the hours that general delivery service is available.
 
 
 62
 I do not doubt that the Postal Service has a legitimate interest in avoiding the expense and administrative burden to the government that might be caused by a general practice of delivering mail to homeless persons at any branch office requested by the person under any circumstances, regardless of need. But I do not believe our Constitution would permit us to ignore, in a case where issues of burden are properly framed for particular persons, that the Postal Service's current policies and regulations in some cases will grievously burden the First Amendment rights of some homeless persons.
 
 
 63
 I see no policy reason advanced by the Postal Service why this must be so. The homeless plaintiffs here have asked only for broad and not for limited relief, and it is not surprising perhaps that the Postal Service in this case did not address whether its regulations could be modified at modest expense to permit general delivery to some homeless persons at branch post offices under demanding individual circumstances. Nonetheless, in assessing the homeless plaintiffs' First Amendment claims, in an appropriate case we will need to consider if the current policies and procedures chosen by the Postal Service are so unresponsive to particular human burdens as to violate the Constitution.
 
 
 64
 All should agree that when a homeless person can make a showing of particular circumstances preventing retrieval of general delivery mail at the main post office, that homeless person will be cut off from all communication by mail with family, friends, the government or others who may want to communicate with him or her. To determine whether grievous burdens on First Amendment rights for some homeless persons rise to the level of a constitutional violation, we must apply the tripartite forum analysis that has been prescribed by the Supreme Court. Cornelius v. NAACP Legal Defense and Educ. Fund, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). It is here where I depart from the panel majority.
 
 
 65
 The first of the three steps is to identify the forum to which the plaintiffs seek access. Id. at 801, 105 S.Ct. 3439. Simply stated, members of the homeless community want to receive their mail. This reflects nothing more, and nothing less, than a basic human need for communication. In feeling this need, the homeless stand on equal footing with others quartered more comfortably. Plaintiffs allege that there is currently no viable way of receiving mail on a regular and reliable basis. Plaintiffs challenge the general delivery service and the no-fee post office box not because the homeless plaintiffs want these specific services but because these services are potential means for plaintiffs to exercise their paramount right to receive mail despite their homelessness. For plaintiffs, seeking access to general delivery service, the no-fee post office box service, or any other service is a way to gain access to the mail system. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46-47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (analyzing as the relevant forum the internal school mail system to which a rival teacher's union sought access). It is access to mail that is the relevant forum.
 
 
 66
 Having determined that the mail system is the relevant forum, the second and next step in the required forum analysis is to determine whether the mail system is a public forum or nonpublic forum. Cornelius, 473 U.S. at 802, 105 S.Ct. 3439.[1] Because the mail system is a "channel of communication" created by the government "for use by the public at large for assembly and speech," id., it can properly be characterized as a public forum. See United States Postal Serv. v. Council of Greenburgh Civic Ass'n, 453 U.S. 114, 137-38, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (Brennan, J., concurring) (concluding that "the mails and the letterbox are specifically used for the communication of information and ideas, and thus surely constitute a public forum"); 39 U.S.C. § 101(a) (requiring that the Postal Service provide the "basic and fundamental service" to "the people."). But cf. Perry, 460 U.S. at 46-47, 103 S.Ct. 948 (concluding that the school's internal mail system was a nonpublic forum).[2]
 
 
 67
 If, as I have concluded, the mail system is a public forum, then the Postal Service regulations challenged by the plaintiffs, namely the general delivery service restrictions, are subject to the "time, place and manner" test. To pass constitutional muster under the "time, place and manner test," the restrictions must be: (1) "justified without reference to the content of the regulated speech," (2) "narrowly tailored to serve a significant governmental interest," and (3) able to "leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).
 
 
 68
 Plaintiffs do not contend that the restrictions on the general delivery service are not content-neutral. The limitation on general delivery mail applies to the homeless whether they receive letters from family or notes from friends, whether they look for correspondence on the lighter affairs of life or letters of the greatest gravity, whether their mail is personal or political, whether it relates to finances or fun. So, the first prong of the "time, place and manner" test is satisfied. All mail to the homeless regardless of content comes with the same burden.
 
 
 69
 As to the second prong, the Postal Service's stated interests in restricting the general delivery service to the main post office are cost and efficiency. Congress established the Postal Service as a pseudo-private agency, giving the Postal Service flexibility to control its costs and develop businesslike plans for economical, effective operations. See Nat'l Ass'n of Postal Supervisors v. United States Postal Serv., 602 F.2d 420, 430-31 (D.C.Cir.1979) (reviewing legislative history and purpose for Postal Reorganization Act). Because Congress intended the Postal Service to operate in a businesslike manner, the Postal Service has a good, strong interest in maintaining low costs. Cf. Kaplan v. County of Los Angeles, 894 F.2d 1076, 1081 (9th Cir.1990) (holding that a public entity does not violate the First Amendment by collecting charges that fairly reflect costs of maintaining a limited public forum). For purposes of the "time, place and manner" test, I conclude that the restrictions are properly and narrowly tailored to serve the government's significant interests because the Postal Service can more effectively keep costs down, to the benefit of all served by the postal system, by limiting the general delivery service to the downtown post office. Ward, 491 U.S. at 798, 109 S.Ct. 2746 (explaining that "narrowly tailored" does not require that the regulation to be the least restrictive means available but rather that the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation").
 
 
 70
 The Postal Service regulations in my view satisfy the first two prongs of the "time, place and manner" test, but the Postal Service's restrictions of general delivery will still run afoul of the third prong, and thus offend the First Amendment, if there are not ample alternative channels for communication. Because the plaintiffs are homeless, the mail service is the only means for them to receive notification of governmental benefits such as veteran's benefits or public housing opportunities. Lacking a physical address, plaintiffs cannot avail themselves of other services offered by the Postal Service, such as obtaining a post office box even for a fee. And, though some homeless shelters and service centers provide mail service, such services are limited and often unreliable.
 
 
 71
 For these reasons, the only viable means for members of the homeless community to receive mail is by general delivery service. Seen in this light, I conclude that the limited general delivery service currently offered by the Postal Service is not sufficient for all homeless persons.[3] While general delivery might be adequate for some homeless persons — those that can reasonably be expected to travel to the downtown post office on a regular basis to pick up mail during the specified times — limited general delivery is not at all sufficient for homeless persons like sixty-one year old Willard Johnson, whose shelter is nine miles from the downtown post office, whose arthritis makes it difficult and painful for him to travel long distances, and who was almost terminated from receiving public assistance because he did not receive notice of a case appointment sent to him at another shelter.
 
 
 72
 Considering that the bulk of the population gets mail delivered to the front step of a home or in the lobby of an apartment building, it is unreasonable to burden homeless persons in all cases, regardless of their individual circumstances, with the task of taking public transportation for several miles at particular hours, during which they might be expected to be at work, if they are to pick up their mail. This concern is exacerbated by the problem that a long and hopeful journey to the main post office in many cases might greet the homeless with nothing but junk mail. These trips are ones that plaintiffs are bound to repeat every couple of days to avoid missing potentially important communication regarding government services. And in some cases, particularly those involving the disabled, there is not merely a grave burden but a practical impossibility for the homeless to reach the main office at required times to get mail.
 
 
 73
 In cases where general delivery service at the main post office is not a practicable venue, or comes only with undue burden, we should see that this effective denial of mail delivery is an egregious infringement of First Amendment rights, particularly when one considers that people who are homeless often do not have access to other important methods of communication such as the telephone or email. Contact through the mail system may be the only way that homeless people can be notified of potentially life-altering information or services such as the availability of public housing, receipt of veteran's benefits, or communications relating to other social services. And it may be the only way the homeless can keep in touch with a parent, a child, or a friend.
 
 
 74
 While I would agree that the Postal Service is not constitutionally required to expand services to any person who is otherwise effectively served by the existing system, and while the Postal Service is not constitutionally required to expand without restraint or condition general delivery services in particular,[4] I would conclude that the Postal Service's current regulations and operation offend the First Amendment by effectively precluding mail delivery to some homeless persons who lack an adequate alternative channel of communication if they practically cannot receive general delivery mail at the main post office.
 
 
 75
 This issue is not squarely presented, and in footnote 9 of the majority opinion, has been left open for another day. As to the Appellants' facial First Amendment challenge to the postal delivery regulations, I disagree with the majority that "non-public" forum analysis applies. Instead, I would hold that the delivery of the mail is a public forum. Nonetheless, applying the test for public forums leads me to conclude that the Appellants' facial challenge must in general fail, though I would reach a different result in the proper "as-applied" case where undue burden was shown. I therefore concur in the judgment of the panel majority as to Part III.A and Part III.B. I also join in full the remainder of the panel majority's opinion.
 
 
 
 Notes:
 
 
 [1]
 Though there are two different types of public fora, traditional or limited, the "time, place and manner" test applies to both limited public fora and traditional public fora when the regulations are content neutral: "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."Perry, 460 U.S. at 46, 103 S.Ct. 948. It is not necessary to decide whether the mail system is a traditional public forum or a limited public forum because it qualifies as at least a limited public forum and thus the constitutional test is the same.
 
 
 [2]
 The Supreme Court's conclusion inPerry was based on the fact that the plaintiffs were not among the class of people specifically permitted by the school to use the forum and were unlike the class of people who were allowed to use the forum. 460 U.S. at 47-48, 103 S.Ct. 948. Here, by contrast, the mail system is open to the public at large and plaintiffs do not fall outside of the operating bounds of the mail system. Cf. Greenburgh, 453 U.S. at 137, 101 S.Ct. 2676 (Brennan, J., concurring) (noting that "[o]nly where the exercise of First Amendment rights is incompatible with the normal activity occurring on public property have we held that the property is not a public forum.").
 
 
 [3]
 That the regulation only impermissibly burdens some, not all or most, homeless persons is why I reject the Appellants' facial challenge to the delivery regulations. But, as applied to those who cannot get general delivery at the main Post Office because of undue hardship, in my view the delivery regulations must give way to First Amendment values. It would be unreasonable to require the Post Office to provide general delivery upon demand at any branch with no particularized showing of need; but it also would be unreasonable to say that the Post Office need not customize a general delivery system in cases where a homeless resident would otherwise be deprived of all mail service if required to access general delivery at the main branch
 
 
 [4]
 Because in a proper case I would conclude that the Postal Service has violated the First Amendment by effectively denying some of the members of the plaintiff class access to the mail system, the Postal Service would be free to adopt any changes to their mail service that would adequately afford all plaintiffs such access. One possible remedy might look like this: The Postal Service could continue to collect all of the general delivery mail at the main post office but allow persons without a physical address to fill out a sworn form or affidavit at the main post office requesting that their general delivery mail be forwarded to another, more convenient post office branch when necessary to avoid a particular undue burden to them based on specific circumstances to which they can attest. The Postal Service could devise a fair-minded standard that would generally accomplish efficiencies but accommodate the unusual cases where a particular undue burden on a homeless person makes a routing of general delivery mail to their neighborhood branch fair and reasonable. The Postal Service might also limit the forwarding requests such that mail could only be forwarded from the main post office to branch offices but not between branch offices, like mail moving from the hub of the wheel outward but not along the rim. Such a system would allow the Postal Service to maintain a centralized location where it could sort and conduct security screening of general delivery mail and at the same time the Postal Service in exceptional cases meeting the undue burden standard could forward the sorted bundles of general delivery mail using a forwarding service that is already established and provided to persons with physical addresses when they move