(Slip Opinion)

# Constitutionality of 18 U.S.C. § 1715

Section 1715 of title 18, U.S. Code, is unconstitutional as applied to constitutionally protected firearms, including handguns, because it serves an illegitimate purpose and is inconsistent with the Nation's tradition of firearm regulation. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022).

The Department of Justice may not, consistent with the Constitution, enforce section 1715 with respect to constitutionally protected firearms. The Postal Service should modify its regulations to conform with this opinion.

January 15, 2026

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In 1927, Congress declared "pistols, revolvers, and other firearms capable of being concealed on the person" to be nonmailable. Pub. L. No. 69-583, § 1, 44 Stat. 1059, 1059 (1927) (codified as amended at 18 U.S.C. § 1715). With some exceptions not relevant here, those who deposit any such firearm in, or cause any such firearm to be delivered by, the mail face criminal sanction. *See* 18 U.S.C. § 1715. Although this statute does not prohibit the shipment of concealable firearms by private companies, major express services currently forbid all persons from shipping firearms, except for some federal firearms licensees that have private shipping agreements.[1] Thus, unlicensed private citizens face a complete ban on shipping concealable firearms, even though handguns are among the core "arms" protected by the Second Amendment. *See McDonald v. Chicago*, 561 U.S. 742, 768 (2010).

---

[1] *See* FedEx, *How to Ship Firearms*, https://www.fedex.com/en-us/shipping/how-to-ship-firearms.html [https://perma.cc/6V97-FZAW] ("The FedEx Service Guide prohibits firearm shipments. However, customers holding a Federal Firearms License (FFL) may work with their FedEx account executive to obtain approval to ship firearms with FedEx."); UPS, *How to Ship Firearms*, https://www.ups.com/us/en/support/shipping-support/shipping-special-care-regulated-items/prohibited-items/firearms [https://perma.cc/9JPG-3ND3] ("Shipments containing Firearm Products are accepted for transportation only from shippers who are federally licensed and have an approved UPS agreement for the transportation of Firearm Products."); DHL, *Restricted Commodities* (Jan. 1, 2021), https://www.dhl.com/discover/en-us/ship-with-dhl/start-shipping/restricted-commodities [https://perma.cc/S3YF-L9S7] (stating that firearms "are not acceptable for transport by DHL under any circumstances").

These prohibitions are jointly enforced by the Postal Service and federal prosecutors. "Nonmailable firearms discovered in the mailstream must be immediately reported to the United States Postal Inspection Service," U.S. Postal Serv. Publ'n 52 § 435 (2025) ("Publication 52"), which is tasked with investigating the matter, 18 U.S.C. § 3061(a). *See also* 39 U.S.C. § 404(a)(6). Investigations are then turned over to the relevant United States Attorney's Office for prosecution. *See, e.g.*, *United States v. Perez*, No. 3:23-CR-00092, 2025 WL 744279, at *1 (D. Conn. Mar. 7, 2025); *United States v. Bernal-Salinas*, No. 5:20-CR-00244, 2022 WL 4084412, at *1 (E.D.N.C. Sept. 6, 2022).

You have asked whether 18 U.S.C. § 1715 infringes the Second Amendment and, if so, whether the Department of Justice should cease prosecuting violations of the statute. We conclude that the restriction imposed by section 1715 violates the Second Amendment. Section 1715 makes it difficult to travel with arms for lawful purposes, including self-defense, target shooting, and hunting. The statute also imposes significant barriers to shipping constitutionally protected firearms as articles of commerce, which interferes with citizens' incidental rights to acquire and maintain arms. Indeed, the statute ultimately aims to suppress traffic in constitutionally protected articles thus rendering the law per se unconstitutional as to those articles, and we are aware of no historical analogues that would satisfy the government's burden of showing that this unprecedented restriction "is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). Because the application of section 1715 to constitutionally protected firearms violates the Second Amendment, we conclude that the Department of Justice should cease prosecutions under the statute with respect to protected firearms. *See Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199 (1994) ("*Presidential Authority*").

## I.

Congress passed Public Law 69-583 as an early federal crime-control measure, seeking to reduce handgun violence by suppressing the proliferation of mail-ordered firearms. During the early 20th century, many state and local governments imposed strict restrictions on the ability of law-abiding citizens to purchase handguns, and the availability of mail-order

firearms was perceived as undermining these state and local firearm regulations. *See* Lee Kennett & James LaVerne Anderson, *The Gun in America: The Origins of a National Dilemma* 193–201 (1975); David T. Hardy, *The Firearm Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589–91 (1987); 69 Cong. Rec. 9693 (1926) (statements of Rep. Christian Ramseyer and Rep. John Miller). Congress responded with Public Law 69-583, which declared nonmailable "pistols, revolvers, and other firearms capable of being concealed on the person," Pub. L. No. 69-583, § 1, 44 Stat. at 1059, and it criminalized depositing such weapons in, or causing them to be delivered by, the mail, even if they are unloaded, *id.* § 1, 44 Stat. at 1060. The law exempted such deposits "for use in connection with" certain government officials' duties as well as for conveyance among firearm manufacturers and bona fide dealers in customary trade shipments. *Id.* § 1, 44 Stat. at 1059–60. Violators faced a fine "not exceeding $1,000," imprisonment for "not more than two years, or both." *Id.* § 1, 44 Stat. at 1060. Public Law 69-583's restriction remains on the books today, codified at 18 U.S.C. § 1715.

The Postal Service implements section 1715 via Publication 52. *See* Publication 52 § 432.2. Publication 52 categorizes "[p]istols, revolvers, and other firearms capable of being concealed on a person" as "handguns" and defines that term to mean "firearm[s] with a short stock designed to be held and fired by the use of a single hand" or "a combination of parts from which a handgun can be assembled." *Id.* § 431.2(a). It also defines "firearms capable of being concealed on a person" to include short-barreled shotguns and rifles. *Id.* § 431.2(b). The Publication then repeats section 1715's dictates, stating that "[h]andguns, and other firearms capable of being concealed on the person," as defined by section 431.2 of the Publication, "are nonmailable." *Id.* § 432.2. It details government officials authorized to ship and receive such weapons. *Id.* § 432.21. And it notes that such weapons "may be mailed between licensed firearm manufacturers, dealers, and importers in customary trade shipments, or for repairing or replacing parts." *Id.* § 432.23.

## II.

"[T]he postal power, like all [of Congress's] other powers, is subject to the limitations of the Bill of Rights." *United States ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson*, 255 U.S. 407, 430 (1921) (Brandeis,

J., dissenting). With respect to printed material, for example, "[i]t is axiomatic that restrictions upon the mail system implicate the First Amendment." *Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 80 (1983) (Rehnquist, J., concurring in judgment) ("A prohibition on the use of the mails is a significant restriction of First Amendment rights."); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305 (1965) (holding postal regulation unconstitutional as a violation of the First Amendment). Likewise, the strictures of the Fourth Amendment apply to the Postal Service. As the Supreme Court has explained, the "constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be." *Ex parte Jackson*, 96 U.S. 727, 733 (1878).

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held that this amendment protects "an individual right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 595). This right extends to "the possession and use of weapons that are 'in common use'" for lawful purposes, *id.* at 2128 (quoting *Heller*, 554 U.S. at 627), which includes "handguns," *Heller*, 554 U.S. at 629. The Court was not writing on a blank slate, but drawing on an older, judicially recognized right to keep and bear arms that "involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871); *see Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." (emphasis in original)). These uses include, for example, target shooting, firearm training, and hunting. *Andrews*, 50 Tenn. at 179; *see also* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880) (explaining that "to bear arms implies something more than the mere keeping it; it implies the learning to handle and use them . . . ; in other words, it implies the right to meet for voluntary discipline in arms"); *Heller*, 554 U.S. at 599. It also includes the right to carry arms publicly for individual or community defense. *Bruen*, 142

S. Ct. at 2134; *Heller*, 554 U.S. at 599 (noting that the Second Amendment's prefatory clause sought "to prevent elimination of the militia").

### A.

Section 1715 substantially burdens the right to bear arms protected by the Second Amendment. An individual cannot mail himself a handgun for core constitutionally protected activity, such as self-defense, target shooting, or hunting. As the examples below illustrate, traveling with a firearm can be difficult, if not impossible, rendering the mail the most effective way to transport an individual's firearm to his destination:

> (1)   A Californian vacationing in Vermont flies into New York. The transportation of his handgun through the New York airport, even if that handgun is properly stowed in his luggage, would trigger an arrest for violating New York's law against possession of an unlicensed handgun. *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Port Auth. of N.Y. & N.J.*, 730 F.3d 252, 257 (3d Cir. 2013).[2]

> (2)   A person driving from Wisconsin to Michigan stops in Chicago for two days. The break in travel would cause him to lose the protection of 18 U.S.C. § 926A, which otherwise protects the interstate transportation of firearms.

> (3)   A person takes a bus from Washington, D.C., to Philadelphia, Pennsylvania. The bus would generally refuse to accept his firearm as baggage.[3]

---

[2] The Department of Justice has previously maintained that such transportation is protected by 18 U.S.C. § 926A. *See* Letter for Rep. Don Young from William E. Moschella, Assistant Attorney General, Office of Legislative Affairs (Feb. 18, 2025), https://cdn.ymaws.com/www.anjrpc.org/resource/resmgr/docs/travelwithguns.pdf [https://perma.cc/7LU8-DBP5]. Nevertheless, it is common in certain states to arrest travelers. *See, e.g.*, *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 132 (2d Cir. 2010) (discussing case in which travelers flying through New York, in compliance with federal law, attempted to transport unloaded firearms in checked baggage yet were "arrested by officers seeking to enforce New York gun laws criminalizing the possession of a firearm without a New York firearm license").

[3] *See, e.g.*, Greyhound Lines & FlixBus, *Permitted and Prohibited Items on Board Coaches* at 2 (2023), https://cdn-cf.cms.flixbus.com/drupal-assets/2023-01/Permitted%20 and%20Prohibited%20Items%20List%20 (DEC% 202022) %20- %20Co-branded_GLI

In these cases (and many others like them), a person has no ability to travel with a firearm, leaving shipment of the handgun to a destination as the only viable method of transportation. But the person cannot use a common or contract carrier to ship himself the handgun because, currently, the large common carriers that deliver parcels refuse to ship firearms for private citizens. And section 1715 forbids mailing the handgun. The Postal Service's ban on mailing handguns thus stifles the legitimate transportation and carriage of handguns for self-defense or any other lawful purpose.

Similarly, section 1715 imposes gratuitous burdens on the right to acquire and maintain firearms. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in judgment); *see also id.* at 26–28 (providing examples); *Andrews*, 50 Tenn. at 178–79 (same principles applied to the right to bear arms). Here, the Second Amendment prohibits the government from infringing upon a law-abiding citizen's right to "keep and bear" arms in common use for lawful purposes. U.S. Const. amend. II; *Bruen*, 142 S. Ct. at 2125–26. This provision, however, would be meaningless if the government could prevent citizens from ever receiving such arms. Indeed, the receipt of a weapon is almost always a necessary predicate to both *keeping* and *bearing* a weapon. Yet section 1715 precludes an ordinary person from *ever* receiving a firearm directly in the mail, even if the seller or donor lives in the same state as the recipient. Instead, the seller or donor must deliver the firearm to a federal firearms license ("FFL") dealer. The donor or recipient must pay the dealer's fee in addition to the shipping cost. And that dealer will then ship the firearm to another FFL dealer from whom the ultimate recipient will retrieve the weapon. The Second Amendment likewise protects the right to maintain firearms in a working condition. Yet an ordinary person who seeks repairs cannot simply mail the firearm to a gunsmith or the manufacturer. The owner must instead deliver the weapon to an FFL dealer, who will send the firearm on the owner's behalf. And the person who conducts the repairs cannot return the weapon directly to the owner;

---

%20&%20FBI.pdf [https://perma.cc/MK97-JS75]; Megabus, *Terms and Conditions* (Nov. 7, 2023), https://us.megabus.com/terms?tID=65f4975466366 [https://perma.cc/B87S-GFND]; Trailways, *Policy of Firearms*, https://trailways.com/carriage-of-firearms-hazardous-materials/ [https://perma.cc/P52R-Z3N3].

he must send the weapon back to the FFL dealer for the owner's pickup. Section 1715 consequently increases the time and expense involved in firearm upkeep.

Section 1715 thus operates as a substantial burden on citizens' Second Amendment rights.

## B.

"Like most rights," however, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. If the text of the Second Amendment covers the conduct, then the government must demonstrate that the infringing regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. In conducting this analysis, one "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *Bruen*, 142 S. Ct. at 2111). "Why and how the regulation burdens the right are central to this inquiry." *Id.* The challenged law and the historical analogues must address a comparable problem and impose a comparable burden on the regulated conduct. *See id.*; *see also Bruen*, 142 S. Ct. at 2131–33. After examining both the traditional scope of the government's power to regulate rights and potential historical analogues, we find that section 1715 serves an illegitimate purpose and is inconsistent with the Nation's tradition of firearm regulation.

First, laws infringe Second Amendment rights if they serve the illegitimate purpose of suppressing the right, regulating the right more broadly than needed for a legitimate purpose, or effectively destroying the right. *See Rahimi*, 144 S. Ct. at 1898 (observing that a law must regulate for a "permissible reason"); *Bruen*, 142 S. Ct. at 2138 n.9 (remarking that a law may not be "put toward abusive ends"); Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 386, 391, 441 (2025). Here, section 1715 serves an illegitimate purpose. The text of the law aims to suppress traffic in constitutionally protected articles: "Pistols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service." 18 U.S.C. § 1715. On its face, then, the statute evinces an attempt to reduce the proliferation of concealable firearms. The law's design singles out for disfavored treatment pistols and revolvers,

"the most popular weapon chosen by Americans for self-defense," *Heller*, 554 U.S. at 629. *Compare* Publication 52 § 432.2 (declaring handguns "nonmailable"), *with id.* § 432.3 (declaring rifles and shotguns "mailable"). And it operates as a practical bar on private citizens' ability to transport and receive in the mail constitutionally protected weapons. Such a purpose—to frustrate protected arms' transportability, thereby making it more difficult for citizens to obtain such weapons—constitutes a per se infringement upon the Second Amendment. *See Rahimi*, 144 S. Ct. at 1898; *Bruen*, 142 S. Ct. at 2138 n.9; Slate, *supra*, at 386, 391, 441.

"[L]egislative history is not the law," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018), but to the extent it is considered at all, it provides further support that Congress designed section 1715 to advance an illegitimate purpose. Congress generally believed handguns were neither arms protected by the Second Amendment, nor particularly useful for legitimate purposes. *See* S. Rep. No. 69-1107, at 2 (1926) ("No one has a constitutional right to carry a concealed weapon like a pistol."); *Carrying of Pistols, Revolvers, and Other Firearms Capable of Being Concealed on the Person in the Mails*: *Hearings on H.R. 4502 Before a Subcomm. of the H. Comm. on the Post Off. & Post Rds.*, 69th Cong. 26 (1926) ("*Hearings on H.R. 4502*") (statement of William McAdoo, Chief City Magistrate, New York) ("There is no attempt to invade the constitutional right of a citizen to carry arms. Anybody can go over the whole United States with a rifle on one shoulder and a shotgun on the other without conflicting with any legislation enacted or proposed. We are dealing with concealed weapons. . . . Pistols and revolvers are of no use as a weapon of defense in the hands of law-abiding people.").[4] Consequently, Congress had no qualms

---

[4] *See also* 67 Cong. Rec. 9693 (1926) (statement of Rep. Harry Ramseyer) ("It makes all firearms that are capable of being concealed on the person nonmailable. Complaints have come to us from cities where they have strict regulation in regard to the sale of firearms that the lawless element, the thugs and holdup men, are able to send to mail-order houses for these pistols, and in that way the local laws and regulations, whether State or municipal, are completely nullified."); *id.* at 9693–94 (statements of Rep. John Miller) ("By wholesome municipal regulation this character of our citizenry, the thug and the scoundrel, can not buy pistols locally, because the regulations and the discretion vested in the municipal authorities will not grant these men the right to purchase a pistol locally. The thug and the scoundrel then resort to the mail-order houses throughout the country, and by sending a sufficient amount to the mail-order houses receive a pistol through the mail, delivered to him at his door, his room, or wherever he may direct. . . .

about suppressing traffic in such articles. But *Heller* and its progeny have thoroughly repudiated the claim that the Second Amendment does not protect handguns.

Second, the law is inconsistent with this Nation's history and tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2129–30. When reviewing colonial and early American state regulations, we sought to "ascertain whether [section 1715] is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1892 (quoting *Bruen*, 142 S. Ct. at 2133 n.7). We did not find any relevant historical tradition of generally prohibiting the shipment of constitutionally protected arms. The three closest analogues we have found are far afield and readily distinguishable.

The first enactment originated in what would later become New York. There, the Director and Council of New Netherland passed an ordinance in 1639 prohibiting the sale of "Guns, Powder and Lead" to Native Americans. *Laws and Ordinances of New Netherland, 1638–1674* at 18–19 (E.B. O'Callaghan ed., 1868). Six years later, in 1645, the Director and Council found that, notwithstanding the 1639 prohibition, individuals continued to sell arms to the natives. *Id.* at 47. The body consequently passed a supplemental ordinance forbidding the transportation of "any munitions of War" from New Netherland "without express permission." *Id.*[5]

The second enactment, passed by the Virginia Grand Assembly in 1675, similarly prohibited conveyance of "powder, shott or armes" to

---

But it is a common form now of the distribution of pistols throughout the country through the mails, due to the stringent regulations in the great majority of our cities regarding the local sale of firearms."); *Hearings on H.R. 4502* at 24 (stating that "the demand for this legislation came largely from the large cities . . . , where they have strict regulations as to the issuing of permits to those who may want to buy a pistol").

[5] During this same period, the New England Confederation likewise prohibited sales of arms to Native Americans. *See The Public Records of the Colony of Connecticut* 113–14, 145–46 (J. Hammond Trumbull ed., 1850) (1665). To effectuate this policy, the Confederation prohibited the "the sale of arms or ammunition to any person out of the confederate jurisdictions" without a license. *Id.* at 145–46 n.*. This statute is inapposite, as it did not regulate citizens' *transportation* of arms either within or outside the Confederation. *See id.* And even if it could be regarded as regulating transportation, it at most represents a firearms export regulation, which is not the issue here.

Native Americans. 2 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* at 336 (William Waller Hening ed., 1823). To effectuate this provision, the Assembly effectively barred individuals from transporting more than "one gunn and tenn charges of powder and shott" more than three miles beyond "the English plantations." *Id.* at 337.

The third enactment, passed by the Maryland Assembly of Freemen in 1776, prohibited the transportation of "muskets or rifles . . . or any gun barrels, gun locks, or bayonets" out of Maryland "without the leave of the [Maryland Council of Safety] for the time being." *Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis, in 1774, 1775, & 1776* at 146–47 (James Lucas & E.K. Deaver eds., 1836).

Take these possible analogues in reverse order. The Maryland resolution, enacted closest to the Second Amendment's ratification, is easily distinguishable. Though the resolution proscribed removing weapons from Maryland, it did so to ensure the common defense of the province in the early days of the American Revolution—not to supplement laws prohibiting certain individuals from possessing weapons. *See id.* at 146–47; *see also* David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 Charleston L. Rev. 283, 297–301 (2012) (discussing British arms embargo and colonial response); *cf. The Colonial Laws of Massachusetts* 125–26 (William H. Whitmore ed., 1887) (1672) (prohibiting exportation of gunpowder to provide for the colony's "necessary use and defence").

The "how" and "why" of the Virginia and New Netherland enactments are also inapposite. Those Acts aimed to prevent the arming of the Indians. At the time, the Indians were frequently at war with the colonists, and they were not recognized to be part of the colonists' political communities. *See* Kennett & Anderson, *supra*, at 51–53. Section 1715, in contrast, does not purport to be a wartime measure designed to prevent Americans from shipping firearms to members of hostile powers.

Nor do we think that section 1715 could be analogized to common colonial restrictions on the storage and transportation of gunpowder. Such restrictions concerned large quantities of gunpowder that, because of its explosive character, could injure persons or property if not properly transported and stored. *See Heller*, 554 at 632 (describing gunpowder regulations as "fire-safety laws"). Such analogues will not support a ban

on transporting unloaded firearms, the conveyance of which does not present an inherent risk to life and property.

To the extent post-ratification history is relevant, *but see Bruen*, 142 S. Ct. at 2136 (cautioning against giving such "history more weight than it can rightly bear"), it, too, fails to support section 1715. As outlined in *Bruen*, states and territories began implementing stricter gun regulations in the 19th century. *See id.* at 2145–54 (surveying regulations). This period also saw the flourishing of private express delivery services such as Wells Fargo & Company, which transported firearms, as well as the rise of mail-order houses such as Montgomery Ward and Sears Roebuck & Company, both of which sold firearms. *See* W. Turrentine Jackson, *A New Look at Wells Fargo, Stage-coaches and the Pony Express*, 45 Cal. Hist. Soc'y Q. 291 (1966); Rita L. Moroney, *History of the U.S. Postal Service, 1775–1984* at 6 (noting that, by 1897, Sears "boasted it was selling . . . a revolver every two minutes"). Yet we have found only one analogous 19th century law, passed by Tennessee in 1879, that criminalized selling, offering to sell, or bringing "into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol." 1879 Tenn. Pub. Acts 96, § 1; *see also* 1901 S.C. Acts 748, ch. 435, § 1 (prohibiting the "transport for sale or use into this State" of "any pistol less than 20 inches long and 3 pounds in weight"). That law was premised on the idea that only handguns of the kind used by the military were constitutionally protected. *See Bruen*, 142 S. Ct. at 2147 & n.21; *Andrews*, 50 Tenn. at 186–87; *State v. Wilburn*, 66 Tenn. 57, 60 (1872). Although Tennessee had a narrower understanding of which handguns qualified for constitutional protection, even this strict regulation is consistent with the principle that we affirm here: The legislature cannot prohibit the shipment of constitutionally protected arms.

## III.

Although we believe that section 1715 is unconstitutional, we note some limits on our opinion.

We do not conclude that the Department of Justice may never enforce section 1715. We conclude only that section 1715 is unconstitutional as applied to constitutionally protected arms. Section 1715, however, extends beyond such constitutionally protected arms to *any* firearms capable

of being concealed upon the person. *See* 18 U.S.C. § 1715. Our conclusion thus does not extend to arms that lack constitutional protection, such as undetectable firearms, *see* 18 U.S.C. § 922(p)(1); or concealable gadget-type guns designed primarily for assassination, like pen guns, *see* 26 U.S.C. § 5845(e). The Postal Service and the Department of Justice may therefore continue to enforce the shipping restrictions found in section 1715 against firearms that lack constitutional protection.

We similarly do not conclude that the Second Amendment creates a positive entitlement to have the government deliver firearms on behalf of customers. Although the Constitution authorizes a postal service, U.S. Const. art. I, § 8, cl. 7, nothing in the Constitution affirmatively requires the government to maintain a postal service or to carry parcels. But Congress, having chosen to maintain a postal service that carries parcels (including handguns for some customers), cannot then discriminate against the carriage of constitutionally protected arms on behalf of private citizens. *Cf. Burleson*, 255 U.S. at 437 (Holmes, J., dissenting) ("The United States may give up the post office when it sees fit, but while it carries it on," Congress must respect the First Amendment.). Though the Postal Service is not a common carrier, *see* 1 Robert Hutchinson, *A Treatise on the Law of Carriers* 90 (J. Scott Matthews & William F. Dickinson eds., 3d ed. 1906), we think the law of common carriers may provide a helpful analogy here. "A common or public carrier is one who undertakes as a business, for hire or reward, to carry from one place to another the goods of all persons who may apply for such carriage, provided the goods be of the kind which he professes to carry . . . ." *Id.* at 41. Common carriers are not required to carry every type of good. *Id.* at 86–87. But once they hold themselves out to carry certain kinds of goods, they owe an obligation to carry such goods for those who offer to pay. *Id.* at 43. The Postal Service routinely transports handguns between authorized shippers and recipients. Section 1715 simply singles out for unfavorable treatment the mailing of handguns by ordinary citizens. We do not think the Second Amendment allows Congress to use its postal power for the purpose of suppressing traffic in constitutionally protected arms.

We also do not conclude that the Postal Service is required to carry ammunition or gunpowder. *See* 18 U.S.C. § 1716(a) (prohibiting the mailing of inherently dangerous articles). Even though ammunition is constitutionally protected, *see Miller*, 307 U.S. at 179–80; *Andrews*,

50 Tenn. at 178, a mailing restriction on all explosives serves legitimate postal needs to prevent injury to postal employees and property. Such facially neutral restrictions do not discriminate against constitutionally protected items. Just like the Constitution does not require the Postal Service to be in the parcel business, neither does it require the Postal Service to be a hazardous shipper. *Cf. The Nitro-Glycerine Case*, 82 U.S. (15 Wall.) 524, 536 (1873) (recognizing the right of common carriers to refuse packages "when there is good ground for believing that they contain anything of a dangerous character"). And with respect to the Second Amendment, such restrictions have ample historical analogues in early American restrictions on the storage and transportation of gunpowder, which could injure persons or property if not properly stored or carefully handled.

The limitations we outline here do not disturb our primary conclusion that section 1715 is unconstitutional as applied to handguns. Handguns fall within the core of the "arms" protected by the Second Amendment. *See McDonald*, 561 U.S. at 768. And unloaded firearms are not inherently dangerous in the same sense as explosives or poisons, which is why the Postal Service already accepts rifles and shotguns for mailing, together with handguns from certain qualified shippers. Consequently, so long as Congress chooses to run a parcel service, the Second Amendment precludes it from refusing to ship constitutionally protected firearms to and from law-abiding citizens, even if they are not licensed manufacturers or dealers.

## IV.

Having determined that section 1715 is unconstitutional in part, we turn to whether you, acting in consultation with the President and pursuant to his delegated authority, may decline to enforce the statute.

The President may decline to enforce enactments that are unconstitutional. *Presidential Authority*, 18 Op. O.L.C. at 199; *see also Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 46–49 (1990); *Recommendation that the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984*, 8 Op. O.L.C. 183, 198 (1984); *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 59 (1980). Several factors inform

the Executive's decision to decline enforcement. First, the Executive "should presume that enactments are constitutional" and, where possible, "construe provisions to avoid constitutional problems." *Presidential Authority*, 18 Op. O.L.C. at 200. Second, the Executive should decline to enforce a statute only if "it is probable that the [Supreme] Court would agree" that the statute violates the Constitution. *Id.* Third, the Executive should carefully weigh the effect of enforcement on individuals' constitutional rights as well as the "likelihood that compliance or non-compliance will permit judicial resolution of the issue." *Id.* at 200–01. We consider each factor here.

As to the first factor, our analysis above demonstrates section 1715 evinces a constitutionally impermissible purpose and does not accord with the Nation's history and tradition of firearm regulation. And while we presume the statute's constitutionality, it is relevant that at the time Congress passed section 1715, very little discussion occurred regarding its constitutionality, *see* Kennett & Anderson, *supra*, at 195, and Congress was operating under a drastically different interpretive framework, *compare, e.g.*, S. Rep. No. 69-1107, at 2; *and Hearings on H.R. 4502* at 26 *with Bruen*, 142 S. Ct. at 2125–57. Moreover, the statute cannot be construed to avoid restricting constitutionally protected conduct. While section 1715's text may cover conduct not protected by the Second Amendment—for example, the shipment and receipt of "weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625—there is no plausible way to read the text as allowing law-abiding citizens to transport and directly receive constitutionally protected weapons in the mail where permitted by state and federal law.

As to the second factor, "it is probable that the [Supreme] Court would agree" section 1715 violates the Second Amendment. *See Presidential Authority*, 18 Op. O.L.C. at 200. In finding section 1715 unconstitutional, we applied the analysis mandated by the Supreme Court in *Bruen* and other recent Second Amendment precedents, and we concluded that, based on the historical evidence, section 1715 is inconsistent with "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

As to the third factor, so long as the Department continues to enforce section 1715, law-abiding citizens will choose not to send constitutionally protected firearms through the mail. They will instead opt to pursue burdensome workarounds or even forgo the transportation, receipt, and

maintenance of their personal firearms. *See supra* Part II.A. And this, in turn, unduly chills individuals' exercise of their constitutional rights.

We are aware of one pre-enforcement challenge, which seeks an injunction against section 1715's enforcement and a declaratory judgment stating that section 1715 violates the Second Amendment. *See* Complaint for Declaratory and Injunctive Relief, *Shreve v. U.S. Postal Serv.*, No. 3:25-cv-214 (W.D. Pa. July 14, 2025). But the scope of that case is uncertain and, in the meantime, we have determined that section 1715 is unconstitutional as applied to constitutionally protected arms. The People's constitutional rights should not be abridged while awaiting the outcome of that case.

Counseled by these factors, we believe that declining to enforce section 1715 to the extent described herein would be consistent with the Executive's duties under the Constitution.

## V.

Section 1715 regulates the ability to transport, receive, and maintain constitutionally protected firearms, which burdens the right protected by the Second Amendment. But section 1715's purpose and burden find no analogue in this Nation's history and tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2129–30. We therefore conclude that the statute violates the Second Amendment insofar as it burdens the rights of law-abiding citizens to ship and receive arms in common use for lawful purposes. Accordingly, the Executive Branch may not, consistent with the Constitution, enforce section 1715 with respect to constitutionally protected firearms, and the Postal Service should modify its regulations to conform with the scope of the Second Amendment as described in this opinion.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*
